UNITED STATES of America, Plaintiff-Appellant,

v.

Emmett W. FARRAR et al., Defendants-Appellees.

No. 27125.

United States Court of Appeals Fifth Circuit.

Aug. 14, 1969.

------

Robert E. Hauberg, U. S. Atty., Jerris Leonard, Asst. Atty. Gen., Jackson, Miss., Robert T. Moore, Merle W. Loper, Nathan Lewin, Elihu Hurwitz, James Murphy, Attys., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Milton H. Mitchell, Carter, Mitchell & Robinson, Jackson, Miss., for appellee, Raymond Lee Hurst, H. R. Pigford, Pigford & Hendricks, Thomas M. Hendricks, Jr., Atty., Meridian, Miss., Jay Homer Hedgepeth, Hedgepeth & Hedgepeth, Donald W. Williamson, Jr., Jackson, Miss., Ernest L. Brown, Macon, Miss., William Allain, Jackson, Miss., for defendants-appellees.

Before AINSWORTH and GODBOLD, Circuit Judges, and DAWKINS, District Judge.

AINSWORTH, Circuit Judge:

On June 2, 1967, pursuant to the model decree formulated by this Court in United States v. Jefferson County Board of Education,[1] the United States District Court for the Southern District of Mississippi issued an order requiring school officials in the Noxubee County School District to institute a freedom of choice plan whereunder parents would be given a 30-day period in which they could elect to enroll their children at traditionally white or Negro schools. Subsequently, the United States moved for a contempt order against these school officials for violating the *Jefferson* decree, and at the same time, the United States brought suit, pursuant to 28 U.S.C. §§ 1345 and 1651, to enjoin eleven white persons who were not parties to the original decree from interfering with the freedom of choice of Negro citizens in order "to safeguard the due administration of justice in its courts and the integrity of its judicial process" and in order to secure relief "from conduct of the [appellees] denying equal protection of the laws to citizens of the United States * * * *" On motion of the Government, the two cases were consolidated for trial. On September 26, 1967, the District Court found the school officials in contempt, and ordered a new choice period for approximately 80 Negro students who had withdrawn their requests to attend previously all white schools. Some nine months later, on June 26, 1968, the District Court dismissed the United States' suit for injunctive relief, from which dismissal the Government has appealed.[2]

Chief Justice John Marshall stated over a century and a half ago that the essence of civil liberty lies in the right of every citizen "to claim the protection of the laws." Marbury v. Madison, 1 Cranch 137, 162, 2 L.Ed. 60, 69 (1803). As the Supreme Court has pointed out on many occasions, federal courts are empowered to fashion such remedies, including the issuance of injunctions, as are necessary to vindicate rights which have been secured under the Constitution and laws of the United States. Bell v. Hood, 327 U.S. 678, 684,

1. United States v. Jefferson County Board of Education, 5 Cir., 1966, 372 F.2d 836, affirmed with modification on rehearing en banc, 5 Cir., 1967, 380 F.2d 385, cert. denied sub nom., Caddo Parish Sch. Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

2. The District Judge's written reasons stated in part as follows:
"It was obvious to the Court that the defendants living in widely scattered areas of the County, did try to persuade certain Negroes who were neighbors or otherwise well known to them, to withdraw their choice forms, but that they did so individually and in isolated instances. Whether misguided or not in their motives these defendants committed no such acts of violence or hostility or wilful violations of federal rights to compare with the situations described in the cases above, relied on by the government, or that would warrant an invasion of defendant's own freedom of expression. * * *"

66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). See also Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 680 79 L.Ed. 1322 (1935); Marbury v. Madison, supra; Bullock v. United States, 6 Cir., 1959, 265 F.2d 683, 691; Brewer v. Hoxie School District No. 46, 8 Cir., 1956, 238 F.2d 91, 98. In United States v. Jefferson County Board of Education, 5 Cir., 1966, 372 F.2d 836, 845–846, affirmed en banc 1967, 380 F.2d 385, we held that the Constitution, as interpreted by the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and subsequent decisions, "requires public school systems to integrate students, faculties, facilities, and activities." We then adopted freedom of choice as a means to that end. See also Green v. County School Bd. of New Kent Co., Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); USA, et al. v. Hinds County Sch. Bd., et al., 5 Cir., 1969, [Nos. 28030 and 28042, July 3]. Thus, when applying the clearly erroneous rule to the lower court's findings of fact,[3] if we discern a pattern of interference and coercion on the part of appellees, designed to deprive Negro citizens of their constitutional right to enroll their children in an integrated school system, this Court is both empowered and obliged to exercise its authority by enjoining appellees from continuing such unlawful conduct.

In this regard, we do not reverse credibility choices of the District Court, for the District Judge found that appellees, in fact, did attempt to "persuade" Negroes to change their choice of schools. Rather, we are concerned with the lower court's characterization of the evidence, and conclusions drawn from the evidence, which we find to be clearly erroneous. With the exception of appellees Dinsmore and Hurst, we find that the conduct of appellees was of such a nature as to warrant injunctive relief. We briefly summarize the salient facts as follows:

■ Appellee Dinsmore operated a cotton gin in Noxubee County. Mastrow Oliver, a Negro citizen who had chosen white schools for his children and who had delivered choice forms of other Negro parents to the Superintendent of Education's office, was a patron of the gin. Dinsmore was present at the Superintendent's office when Oliver delivered the choice forms, and on the same day, he filed suit against Oliver and his two brothers for collection of debts owed Dinsmore's gin. The Oliver accounts dated back to 1964, substantial payments had been made on them in 1965 and 1966, and Dinsmore testified that prior to July 31, 1967, he had never sued a gin patron for the collection of accounts. Dinsmore had other accounts which were older and which involved larger sums of money. Though there is strong suspicion that appellee Dinsmore's conduct was motivated by a desire to punish Oliver for choosing to send his children to white schools and for assisting others in doing so, we are unable to say, considering the paucity of evidence, that the District Court's ruling as to this defendant was clearly erroneous.

■ The situation is different as to appellee Lanier, who visited Howard and Eugenia Spann, Negro grandparents of three children who had chosen to attend white schools, on a number of occasions in late July 1967. It is uncontradicted that Lanier told the Spanns that there might be "trouble" if they didn't convince their son to withdraw his children from the white schools, that Spann might lose his job, and that Spann would "regret" a decision to the contrary. The record also discloses that appellee Lanier visited Sally Mae Beck, a Negro parent who had chosen to send her two children to white schools, and told her that she would not

---

3. See, e. g., Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774; American Motors Corp. v. Mosier, 5 Cir., 1969, 414 F.2d 34.

"A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. * * * *"

Chaney, supra at 776 of 368 F.2d.

**940**

be able to sell her farm products if she failed to change her decision. Lanier also visited Mrs. Beck's sister, Mrs. Jackson, and both sisters ultimately withdrew their choices of white schools.

■ Appellee Vernon J. Hill, on July 28, 1967, visited Nelson Short, a Negro citizen and neighbor who had chosen to enroll his four children in the white schools of Noxubee County, and warned him that he should not have chosen white schools, that he had a list of all Negroes who had done so, and that it would cause "trouble." During this visit, Hill carried a pistol in his back pocket, and Short was aware of this fact. On July 30, 1967, Hill returned to the Short home, somewhat inebriated, and again warned Short about his decision. On this occasion, Hill's pistol fell out of his pocket. Subsequently, Nelson Short withdrew his choice of white schools. Appellee Hill does not deny making the statements attributed to him.

■ Astor Hill, one of the appellees, visited the home of Chester Walker, a Negro, two or three times during the end of July 1967. Walker had chosen to send his grandchild to a white school. Hill testified that he had visited the Walker home in the past to repair the electrical wiring, that he considered him and Walker "dear friends," and that he merely wished to make certain that Walker was "doing the right thing." Hill admitted that he had stated that he was afraid that there would be "bickering and fussing" if Negro and white children boarded the same buses, and this discord "might involve the parents." Walker testified that "Mr. Hill, he's the first white person that ever come to my house," that Hill said that Walker's grandchild would be insulted, and that the other Negro parents had withdrawn their choices of white schools. Walker also testified that during Hill's last visit, he told Walker's wife that he wasn't going to talk to him "one more time." Jake Walker, a Negro, testified that Hill told him to tell Chester Walker that unless the Negroes in Noxubee who had chosen white schools with-

drew their choices, "We might get hurt." Walker changed his choice to a Negro school as did Virginia Taylor, Ruby Hughes, and Gilbert Hunt, other Negro parents to whom Hill had spoken.

■ J. J. Rogers, a Constable in Noxubee County, visited Homer Walker and his wife Josie Hampton Walker, Negroes, on two occasions in order to discuss the Walkers' decision to enroll their 13-year-old grandchild in a white school. Rogers warned that other Negroes had withdrawn thir choices of white schools, and that the child "might be in school by himself all alone." He added further that "You know how it is, a boy being in this place and being the only colored guy there." Rogers also stated, inaccurately, that the School Superintendent had not written the cards notifying the parents of their freedom of choice. Rogers had never before visited the Walkers' home. However, the Walkers were aware of the fact that he was some sort of law enforcement officer. Mr. and Mrs. Walker withdrew their choice of a white school, and in explaining this decision, Mrs. Walker testified that "I didn't want to be independent and fighting them or anything like that knowing how they felt." Rogers did not testify because of deafness.

■ J. C. Simpson, in addition to appellee Rogers, visited the home of Homer and Josie Hampton Walker on July 31, 1967, in order to convince them to withdraw their choice of a white school. Simpson admitted stating that he thought the Walkers should "reconsider and go back to the school you was at," and offering to drive Mrs. Walker to the office of the Superintendent of Education in order to change her choice. According to Mrs. Walker, Mrs. Simpson, who accompanied her husband, stated that school integration was "Communist inspired." Mr. Simpson denied this allegation, and testified that his wife stated that "we'd hoped that we'd never see nothing like this going on that's going on in Detroit and these other places up north." Mrs. Walker had worked for the

Simpsons part time for a period of some 15 or 16 years. Subsequent to the Simpsons' visit, they drove Mrs. Walker to the office of the Superintendent of Schools where she withdrew her choice of a white school.

■ According to uncontradicted testimony, Reece Cade, Mayor of Brooksville in Noxubee County, an appellee herein, visited Scott Stewart twice on July 31, 1967. Stewart was a Negro parent who had executed choice forms in favor of white schools for two of his three children. On the first visit, appellee Cade was accompanied by his cousin Frank Cade, who was Stewart's employer. Reece Cade also had employed Stewart to perform occasional jobs. Reece Cade asked Stewart whether he had "thought about his children being the only ones in the white school and asked him didn't he think he was making a mistake and would he like to take them out." Stewart withdrew his choice.

Mayor Cade also visited Mrs. Shelton, convinced her to change back to a Negro school, and drove her to the Superintendent's office to make the change. Cade had built her home, and admitted having the mortgage on her land.

■ On May 4, 1967, appellee Hurst, manager of the Noxubee County Cooperative, referred 16 accounts to Justice of the Peace Woodfin for collection. Included within these accounts was a debt of $73.25 which Mastrow Oliver, a Negro who had collected choice forms, owed the Cooperative. On May 12, 1967, Oliver arranged to pay $10.00 per month on the debt, and subsequently, he made payments on May 12, June 30, and July 28. On the day following the end of the choice period, August 1, suit was brought on Oliver's debt despite the fact that he had made a payment only four days earlier. Many other accounts among the 16 which were referred to appellee Woodfin were not sued upon even though no payments had been made on them. Appellee Hurst testified that he did nothing to initiate the filing of the suit against Oliver, and that the collection of the accounts was left entirely to the discretion of appellee Woodfin. Woodfin testified that Hurst swore to the affidavit necessary for a summons to issue against Oliver, but Hurst denied this allegation, and only Woodfin's name appears on the affidavit. There is little evidence to support the contention that Hurst influenced the filing of suit against Mastrow Oliver after May 4, 1967, nearly two months before the beginning of the choice period. However, as to appellee Woodfin, who had the discretion in collecting the accounts, we conclude that the coincidence of the filing of suit and Oliver's active role in the freedom of choice plan was not accidental.

■ Appellee Emmett W. Farrar, Sheriff of Noxubee County, was present at the courthouse when Mastrow Oliver delivered the choice forms of a number of Negro parents who had chosen to send their children to white schools. According to Oliver, he was met by a crowd of 15–18 men, including Farrar, standing in a hallway when he delivered the forms, and Sheriff Farrar stated that "you ain't got no damn sense," that he would "break" Oliver's neck and that he wanted to talk to Oliver after he had finished in the School Superintendent's office. Oliver also testified that Sheriff Farrar served him with a summons on one of the debt collection suits that had been filed against him, and that Farrar had said at that time that Oliver would be getting more and more suits filed against him because "you niggers were going to stir up something anyhow." Farrar also allegedly said that he would no longer protect Oliver. Appellee Farrar denied making these statements. However, he admitted that he was present when Nelson Short withdrew his choice of a white school and that he told Short "I thought he was doing the best thing for his children." Farrar also was present when appellee Lanier brought Mrs. Beck and Mrs. Jackson to the Superintendent of Education's office to change their choices, and he witnessed the papers for the withdrawal of a choice by one Oscar Ivey.

■ Fred Lavender, Administrator of the Noxubee General Hospital, discharged Mrs. Mary Frances Brown, a Negro parent who had chosen to enroll her child in a white school. The Government alleges that Mrs. Brown lost her job in retaliation for her choice, and appellee Lavender asserts that Mrs. Brown was discharged for good cause—insubordination and violation of hospital rules.

The undisputed evidence shows that Lavender visited Mrs. Brown at her home on the Saturday afternoon preceding the end of the choice period for the purpose of discussing the withdrawal of her choice of a white school for her child; that it would be better for the child if she attended a Negro school. Mrs. Brown testified that Lavender stated that her daughter would probably be the only Negro in her class, and that she would be put back three years in a white school. Lavender denied making these statements. Mrs. Brown also testified that she asked Lavender if she would be fired for not withdrawing her choice, and that Lavender replied, "It's up to the Board." Lavender denied making this response to Mrs. Brown's question. However, Mrs. Arabelle Fenner, the hospital's head cook, corroborated Mrs. Brown's testimony in part, testifying that she had been in Lavender's office on the day before the discharge, and that Lavender had indicated that he "didn't know what he was going to do with Mrs. Frances Brown" because she had chosen a white school for her daughter.

The circumstances of the discharge on August 8, 1967 are disputed. Lavender testified that Mrs. Brown was fired for insubordinate remarks when he found her in a patient area of the hospital, whereas his dietician, Mrs. Brown's immediate superior, testified that Mrs. Brown had been discharged for breaking a hospital rule prohibiting kitchen help from entering patient rooms. Both Mrs. Brown and another worker who was present when Lavender spoke to Mrs. Brown testified that she did not make any insubordinate remarks. In addition, the record discloses that no other hospital employee had been discharged for breaking the rule against entering patient rooms, and that the rule often was violated.

We deem it inappropriate to order reinstatement and back pay in a suit in which neither Mrs. Brown nor the Noxubee County General Hospital is a party. Our decision is without prejudice to Mrs. Brown's rights, however.

Appellees' conduct during the last five days of the choice period resulted in the withdrawal of 75 of the 93 choices of white schools by Negro students. The effectiveness of appellees' conduct is obvious. In nearly all instances, law enforcement officials or some persons in economically advantageous positions visited the homes of Negroes to exert pressure against them for choosing white schools. We cannot characterize such conduct as a proper exercise of First Amendment rights of freedom of speech under the circumstances of this case. As Mr. Justice Frankfurter stated, "The mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity." Avery v. State of Georgia, 345 U.S. 559, 564, 73 S.Ct. 891, 894, 97 L.Ed. 1244 (concurrence) (1953). Injunctive relief against all appellees (defendants), except Dinsmore and Hurst, should have been granted by the District Court to counteract the harassment and retaliation against Negro citizens for exercising rights guaranteed to them as free Americans.

Reversed with directions to enter the necessary injunction; affirmed as to appellees Dinsmore and Hurst.