202

Rebecca FRANCIS, Plaintiff,

v.

AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY, LONG LINES
DEPARTMENT, Defendant.

Civ. A. No. 2800-68.

United States District Court,
District of Columbia.

May 3, 1972.

James O. Porter, Washington, D. C.,
for plaintiff.

Milton C. Denbo, and Robert W. Jef-
frey, Washington, D. C., for defendant.

## MEMORANDUM OPINION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

WADDY, District Judge.

This is an action brought pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The complaint alleges that the defendant, American Telephone and Telegraph Company, Long Lines Department, engaged in unlawful employment practices with respect to plaintiff, Rebecca Francis, a Negro former employee of the company.

The alleged unlawful employment practices complained of are (a) that plaintiff was harassed and unduly reprimanded by her supervisors, was denied access to certain supervisory personnel, and was limited in her promotional opportunities because of her race in violation of 42 U.S.C. § 2000e–2 and (b) plaintiff was discriminated against, harassed and eventually fired in violation of 42 U.S.C. § 2000e–3 in retaliation for having filed a complaint with the Equal Employment Opportunity Commission.

Prior to filing suit plaintiff submitted her complaint to the Equal Employment Opportunity Commission (hereinafter EEOC). On October 9, 1968, plaintiff was notified by EEOC that the Commission's conciliatory efforts had failed to achieve voluntary compliance with Title VII of the Civil Rights Act of 1964 and that within thirty days of the receipt of the notification plaintiff could institute a civil action in the appropriate Federal District Court. This action was filed November 8, 1968.

The plaintiff seeks injunctive relief, reinstatement, back-pay, costs and attorney's fees. The plaintiff also seeks to have this action certified as a class action and claims to be a proper representative of a class consisting of all Negro employees of the Long Lines Department of American Telephone and Telegraph Company and all Negro applicants for employment at said department who have been subjected to similar unlawful employment practices.

The case came on for trial before the Court without a jury. The evidence adduced at the trial established the following facts and forms the basis for the conclusions hereinafter stated:

The plaintiff, Rebecca Francis, a Negro, is a resident of the District of Columbia and is a former employee of American Telephone and Telegraph Company, Long Lines Department (hereinafter AT&T). She was hired on October 19, 1965, and worked in the District of Columbia office of the company until she was dismissed on May 22, 1967.

The defendant, AT&T, is a corporation doing business and maintaining an office in the District of Columbia.

On October 19, 1965 plaintiff was hired by the defendant as a Records Clerk, Title Grade 4, and was assigned to a billing group within the Accounting Department of AT&T. The plaintiff was initially assigned to work that would ordinarily be performed by a Title Grade 3 employee pending an opening at a Title Grade 4 level. When an opening did occur, Linda Masters, a white employee, at a Grade 3 level was promoted to the Grade 4 level and given the position. The reason given by the company for promoting Linda Masters into the position rather than offering it to the plaintiff was that Linda Masters had been employed by AT&T longer than plaintiff. The plaintiff alleges that the assignment of the white employee to the Title Grade 4 work ahead of her was due to racial discrimination. However, the plaintiff, even though assigned to work that would ordinarily be performed by a Title Grade 3 employee, at all times during this period received compensation at the Grade 4 rate. Within a short period of time after Linda Masters' promotion plaintiff was also assigned to Grade 4 work in the billing group. The Court finds that the promotion of Linda Masters to the Title Grade 4 job before

plaintiff was assigned to work in that grade was not based on race.

When plaintiff began working in the billing group she became friendly with Linda Masters and another white employee and they often spent their coffee breaks together. Mrs. Margaret Clark, their immediate supervisor, a white woman, instructed them that she wanted no more than two employees taking a break at one time. Plaintiff alleges that this order was given by the supervisor to prevent her from associating with white employees inasmuch as the two white employees continued to take their breaks together and she was forced to take her breaks with an employee from another department. However, plaintiff in her testimony stated that Mrs. Clark never specified with whom plaintiff was to take her breaks as long as only two employees were away from their desks at once. The instruction did not limit plaintiff's association with any other employee but was applicable to all employees in the group.

Plaintiff and other employees in her group were not always punctual in arriving for work and returning from breaks. In December of 1965 and in February of 1966 Mrs. Clark conferred with plaintiff about what Mrs. Clark considered to be an excessive number of times plaintiff had been late reporting for work in the morning. In May of 1966, approximately seven months after she was hired, plaintiff asked Mrs. Clark why she had not yet been promoted to a Title Grade 5. Mrs. Clark replied that plaintiff did not merit a promotion because her record indicated that she had been late reporting to work for one-third of the work days in February, for one-half of the work days in March and for two-thirds of the work days in May. The evidence shows, however, that during the subsequent month plaintiff became more punctual and on June 26, 1966 she was promoted to the position of Reports Clerk, Title Grade 5.

After her promotion to the Grade 5 level, she was assigned to the P–1075 Group of the Accounting Department. The function of this group was to process forms (P–1075 forms) on which credit allowances were made to AT&T's private line service customers for periods of time when such services had been interrupted. The plaintiff became one of several employees who processed these forms.

On September 9, 1966 plaintiff was called into a meeting with her new supervisor, Mrs. Marilyn Fitzgerald, a white woman, and Miss Marie Mott, a white woman, the Accounting Department Manager. The meeting was called because the plaintiff had been tardy three days out of four that week and Miss Mott had received complaints about plaintiff's loud personal telephone conversations disturbing other employees. Miss Mott warned plaintiff that if she did not become more punctual and curtail her use of the telephone she would be fired. The plaintiff was again reprimanded for excessive tardiness and phone use in November of 1966 by Mr. Gary Holcomb, a white man, who was the second level supervisor to whom Mrs. Fitzgerald reported.

On February 1, 1967 Mrs. Elaine Johnson, a Negro, replaced Mrs. Fitzgerald as plaintiff's immediate supervisor. The pattern of employee tardiness, including that of plaintiff, persisted under Mrs. Johnson. Mrs. Johnson counseled with plaintiff concerning her conduct and, on February 15, 1967, reprimanded her for absenteeism, tardiness and excessive phone use.

On February 16, 1967, plaintiff filed a complaint with the Equal Employment Opportunity Commission alleging that she was being denied employment opportunities by her employer, AT&T, because of her race.

Shortly after plaintiff filed the complaint with the EEOC a meeting was scheduled for supervisory personnel at the second level and above in the Wash-

ington office of AT&T at which the supervisors were informed that plaintiff had filed a complaint with EEOC. At the meeting Elaine Johnson and Gary Holcomb were told by Mr. Kaub, Division Accounting Manager, that "they would have the responsibility of documenting this case as it progressed, working with the attorney to prepare the case, keeping their eyes and ears open and so forth." The supervisors in general were told "to keep your eyes and ears open, if you saw anything that looked significant to write it down, and bring it to the attention of the proper persons."

In further reaction to the filing of the complaint the following actions were taken: (a) Mr. Holcomb was taken off his regular assignment in "order to document this situation very carefully", (b) there were a large number of meetings with attorneys and closed door sessions attended by Miss Mott and Mr. Holcomb in preparation for the eventuality of a hearing by the EEOC, (c) plaintiff's coffee breaks were timed and observations were made of who accompanied her on coffee breaks. The company feared that she was "teaming up" with Sandy Parker, another Negro employee.

Shortly after the plaintiff had filed her complaint with EEOC she approached Mr. Baggett, a white former Data Systems Supervisor of AT&T, and asked if she could discuss with him some of the problems she was experiencing with the company. He stated that he would meet with her if she obtained her supervisor's permission. Mrs. Elaine Johnson and Mr. Gary Holcomb both gave plaintiff permission for the meeting but, after plaintiff had been conversing with Mr. Baggett for about 45 minutes Mr. Holcomb entered the room and stated that the conversation could continue only if he were in the room. Not wishing to continue the conversation under that condition, the plaintiff left the room. Mr. Baggett stated that Mr. Kaub and Miss Mott were irritated

that he consented to meet with the plaintiff.

Mr. Baggett was subsequently instructed by Mr. Kaub to document his entire conversation with plaintiff. Mr. Baggett had on previous occasions held meetings with employees who were not under his supervision at their request but this was the first time that he was required to submit a written report of the conversation to his superiors.

After plaintiff filed her complaint she approached other employees in an attempt "to get us to stand together, to say what had happened to us, and under what circumstances." One such employee who was approached by plaintiff was Mrs. Evelyn Turner Sims, another Negro employee assigned to the P–1075 group. Subsequently Mrs. Sims was told by Mr. Holcomb that anything plaintiff said to her about the company she was to bring to the attention of her supervisor and that Mrs. Sims was not to associate herself with what plaintiff was doing.

Miss Victoria Ernestine Silver, a Negro employee of AT&T assigned to the Telpak group overheard a conversation between Mr. Holcomb and Miss Johnson, the substance of which she described as follows:

"The contents of the conversation was to keep a running account of everything that Miss Francis did as in relationship to the time she came in and when she left to go on a break, what time she returned, the time she left for lunch, who she associated with —practically everything that she did and every place that she went. She was to be constantly watched."

The evidence established further that after the plaintiff filed her complaint with EEOC she was reprimanded by the supervisor, Elaine Johnson, for tardiness and excessive phone use with noticeably greater frequency than other employees who engaged in similar conduct. Contrary to the general practice plaintiff's

calls were monitored on an extension and a record kept of her personal calls. The plaintiff was frequently called away from her work to have meetings with Mrs. Johnson about alleged infractions.

Victoria Silver testified that after plaintiff filed her complaint she was the only employee in the group that was constantly reprimanded for being late and that Sandy Parker on several occasions arrived after the plaintiff and was not reprimanded. Miss Silver also testified that Mrs. Johnson recorded the number of personal calls engaged in by the plaintiff. She determined whether or not the calls were personal by listening on an extension. Miss Johnson did not record the number of personal calls engaged in by other employees.

One employee testified that after plaintiff filed her complaint:

"Well I noticed several people and in particular myself—I wasn't too punctual—and other employees were not reprimanded as much or more—I know I should have been reprimanded more."

Another employee testified that after the plaintiff filed her complaint "She was placed on every limitation that other girls had privileges on—all breaks, the telephone, xerox machine and so on."

Prior to the filing of her complaint with EEOC plaintiff had never been suspended from her employment. However, between the date she filed her complaint with the EEOC and the date of her dismissal she was placed on disciplinary suspension on three occasions. The first suspension occurred when plaintiff became upset at work and left the office at about 2:05 p. m. without her supervisor's permission. She was suspended for the next working day without pay.

The second suspension occurred when plaintiff was late reporting for work on April 11, 1967 after she had been reprimanded on the prior day for tardiness. She was suspended on this occasion for the next two working days without pay.

As a result of the second suspension, plaintiff filed a grievance with her Union, the Communications Workers of America. The Company and Union representatives met on three occasions. Pursuant to a request for data to support the disciplinary action taken, Company representatives presented the Union representative with a list of eighty-one occasions when plaintiff had been late for work in the morning, late coming back from lunch or late in returning from break periods. The Union representative took the grievance no further than those meetings.

One of the Union representatives, Mrs. Raydonia Reed, a Negro, stated that the Union did not have access to the personnel records of other employees so that it could not compare plaintiff's tardiness record with that of other employees. Accordingly the Union could go no further with the grievance since it did not have sufficient information to rebut the information compiled by the company. The evidence at the trial of this case establishes that plaintiff was the first employee in the P–1075 group to be suspended for tardiness.

Plaintiff's third disciplinary suspension occurred on May 17, 1971. On May 15, 1971, plaintiff was advised by Mrs. Johnson that until further notice she would not be permitted to use the official telephone for personal transactions without the permission of her supervisor. Plaintiff was instructed not to place any personal calls without permission and in the event she received a personal call that was not due to an emergency, she was to advise the calling party that she would have to call back later. Mrs. Johnson stated that these instructions were directed exclusively to plaintiff because she was the only employee who had abused her telephone privileges to the extent that such disciplinary measures became necessary. On May 17, 1967, plaintiff was observed by Mrs. Johnson to be using the telephone for a

personal conversation and was suspended without pay for two days.

On May 22, 1967, the first working day following the two day suspension imposed on May 17, 1967, plaintiff was again observed by Mrs. Johnson to be using the telephone for a personal call without permission. Mrs. Johnson called Miss Mott, the Accounting Department Manager, and requested permission to dismiss the plaintiff. Miss Mott and Mrs. Johnson met with the plaintiff and dismissed her. The basis for her dismissal according to Mrs. Johnson was that she "did not comply with the rules and guidelines that were set forth for all employees. That would have included reporting to work on time. She was continuously late in the morning and returning from lunch. She took excessive break periods. She was often away from her desk. She was most often on the telephone. She had temper outbursts. All of these. She refused to follow guidelines and I couldn't help her."

■ This Court has considered the separate incidents of alleged racial discrimination and all of the evidence as a whole and has concluded therefrom that plaintiff has not established that she was denied equal employment opportunities by the defendant because of her race in violation of 42 U.S.C. § 2000e–2. It is clear from the evidence that plaintiff was never an exemplary employee during her tenure at AT&T and that she frequently violated the rules relating to her employment. It is equally clear that other employees, both white and Negro, were equally guilty of similar violations and derelictions of duty and that, prior to the time plaintiff complained to EEOC, there was no substantial difference in the manner the defendant treated those who were guilty of such violations and derelictions of duty.

■ After plaintiff complained to EEOC, however, the manner in which plaintiff was treated was changed and a procedure applicable only to her and directed solely to her EEOC complaint was inaugurated. The supervisors were directed to keep "their eyes and ears open"; to write down and bring to the attention of the proper persons "anything that looked significant". Plaintiff was to be constantly watched. A running account of everything she did, where she went, and the persons with whom she associated was to be kept. It is significant that these instructions did not relate to past conduct of plaintiff but were directed to plaintiff's conduct occurring subsequent to the filing of the EEOC complaint. This fact and other evidence clearly demonstrate that after plaintiff complained to EEOC defendant set out to build and document a case against her for the sole use of defending against the EEOC complaint. One supervisor was taken off his regular assignment in "order to document" the case very carefully. Contemporaneously with those instructions the defendant began and applied to plaintiff a pattern of oppressive supervision, constant surveillance and special conditions of employment that was not applied to other employees in the group who, except for the filing of the EEOC complaint, were similarly situated. As hereinabove found, "She was placed on every limitation that other girls had privileges on—all breaks, the telephone, xerox machine and so on." There were increased reprimands and suspensions, and finally firing for conduct similar to that in which she and other members of the group had engaged in prior to the filing of the EEOC complaint. The Court finds and concludes that this course of conduct on the part of defendant's supervisory personnel was in retaliation against plaintiff for filing a complaint with EEOC and discriminated against her for making the complaint, and thus was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, which provides that:

"(a) It shall be an unlawful employment practice for an employer to dis-

criminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

During the trial of this action the plaintiff failed to present any evidence as to the monetary damages she suffered as a result of the alleged discriminatory practices. The plaintiff offered no evidence of her rate of compensation during her period of employment with AT&T nor did she offer any evidence of wages earned at subsequent employment which the Court must take into consideration in arriving at an allowance for back pay should it find that the plaintiff is entitled to such an allowance.

The only evidence even proffered by plaintiff relating to grounds for an award of monetary damages due to injuries suffered as a result of unlawful employment practices was the allegation that plaintiff developed mucous colitis, neuro-dermatitis and internal hemorrhoids in April of 1968 due to the defendant's harassment of her. Dr. Edward C. Mazique, the plaintiff's doctor and the only expert witness to testify on the subject, stated unqualifiedly that he could not pinpoint the cause of these ailments. The plaintiff failed to establish any nexus whatsoever between her illnesses and her employment.

■■ The Court recognizes that in suits brought pursuant to Title VII of the Civil Rights Act of 1964 there is a presumption in favor of certifying them as class actions as racial discrimination is by its very nature class discrimination. Oatis v. Crown Zellerbach Corporation, 398 F.2d 496, 499 (5th Cir. 1966). However, in view of the Court's finding that the plaintiff was not discriminated against on the basis of her race and in the absence of any evidence of the existence of other members of the class or of a company-wide policy of racial discrimination the Court does not feel that certification of this case as a class action as requested in the pleadings is appropriate. The plaintiff has also failed to show that there are other employees who have been discriminated against by defendant after filing a complaint with the EEOC. Discrimination in retaliation for filing a complaint with the EEOC unlike racial discrimination is not by its very nature class discrimination. Thus in the absence of some showing that other employees have suffered similar discrimination or that it is a company-wide policy, the Court cannot certify the suit as a class action on this basis either.

Having found that the course of conduct of the defendant's supervisory personnel in reaction to plaintiff's complaint violated 42 U.S.C. § 2000e–3(a) and recognizing that 42 U.S.C. § 2000e–5(g) grants the Court plenary power to fashion relief which will terminate such discriminatory practices and make the victims of the discriminatory practices whole, Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1202 (7th Cir. 1971), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), the Court will order that:

(a) plaintiff be reinstated in the position she held at the time of her dismissal;

(b) defendant be enjoined from subjecting plaintiff to any special regulations or conditions of employment or denying plaintiff equal employment opportunity in any manner subsequent to her reinstatement;

(c) plaintiff be awarded the compensation to which she would have been entitled if she had continued in defendant's employ from the date of her discharge to the date of this decision less any wages earned by plaintiff from other employment during this period;

(d) plaintiff be awarded reasonable attorney's fees and costs.

The Court will retain jurisdiction of the case so that plaintiff may submit, within ten days from this decision, financial data to the Court from which the specific amount of back pay differential to be awarded may be determined. The plaintiff's attorney will also submit within ten days a statement of services from which the Court may determine reasonable attorney's fees and costs. A copy of all financial data provided to the Court is to be served upon the defendant and it will be allowed ten days from the date of service to submit responsive papers.[1]

---

[1]. The Court may retain jurisdiction of the case after trial in order to allow supplemental information to be filed when keeping the record open will assist the Court in devising a remedy which will effectuate the policies of Title VII of the Civil Rights Act of 1964. Cf. Sprogis v. United

Air Lines, Inc., 444 F.2d 1194, 1201–1202 (7th Cir. 1971), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971) ; Bowe v. Colgate-Palmolive Company, 272 F.Supp. 332, 368–371 (S.D. Ind.1967).