EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,

v.

LOCALS 14 AND 15, INTERNATIONAL
UNION OF OPERATING ENGI-
NEERS, et al., Defendants.

No. 72 Civ. 2498 (CHT).

United States District Court,
S. D. New York.

Oct. 14, 1977.

878

EEOC, Washington, D.C. by Abner W. Sibal, Gen. Counsel, William L. Robinson, Associate Gen. Counsel, David W. Zugschwerdt, Asst. Gen. Counsel, Philip B. Sklover, Supervisory Trial Atty., Frederick S. Mittelman, Trial Atty., Washington, D.C., for plaintiff.

Ronald G. Copeland, New York Regional Office EEOC, New York City, for purposes of Local Rule 4(a).

Corcoran & Brady, New York City by Robert D. Brady, New York City, for Local 15.

MEMORANDUM

TENNEY, District Judge.

Plaintiff Equal Employment Opportunity Commission ("EEOC") has applied herein for an order pursuant to Rule 65 of the Federal Rules of Civil Procedure to enjoin and restrain defendant Local 15 of the International Union of Operating Engineers ("Local 15") "from harassing, intimidating, demoting, suspending, discharging or in any other way discriminating against any person because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing authorized by Title VII" of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*

This present controversy has its roots in a pattern-and-practice-of-discrimination suit brought by the EEOC and tried before this Court three years ago. This Court entered its decision on May 6, 1976, *EEOC v. Local 14, Int'l Union of Operating Engineers*, 415 F.Supp. 1155 (S.D.N.Y.1976), and its remedial order on September 1, 1976. Defendants, including Local 15, appealed from the aforementioned decision and remedial order, and, on December 15, 1976, the United States Court of Appeals for the Second Circuit entered an order whereby the District Court was stayed in the enforcement of the decree and all other proceedings pending determination of the appeal. The court of appeals issued its decision on March 21, 1977. *EEOC v. Local 14, Int'l Union of Operating Engineers*, 553 F.2d 251 (2d Cir. 1977). Timely petitions for rehearing were filed and denied, and the case remanded to this Court on August 24, 1977.

On May 12, 1977 the EEOC brought the instant motion before this Court. After expedited discovery, trial of the issue was held on June 6–7, 1977. Basically, two questions are presented to the Court at this time:

(1) Does the Court have jurisdiction over this controversy?

(2) If so, does the evidence submitted to the Court present a case of retaliation against witnesses sufficient to permit the entry of preliminary relief against defendant Local 15?

## Jurisdiction

■ It seems clear that this Court has jurisdiction over the present controversy on three separate grounds: (a) by reason of the Court's inherent power to preserve its process and to prevent and rectify punishment of those who appeared before it; (b) by reason of the jurisdiction the Court retains, untouched by the court of appeals stay, to prevent a party from taking steps which would prejudice and hinder later proceedings in the case; and (c) by virtue of its independent jurisdiction under Sections 706(f)(2)–(3) of Title VII, 42 U.S.C. §§ 2000e–5(f)(2)–(3).

With respect to the first ground, it has been recognized from the very first days of our country that

"[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of the government is to afford him that protection. . . ." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).

■ Part of this duty of the government to provide the protection of law is that litigants and witnesses who appear before federal courts do so secure in the knowledge that they cannot be harassed, intimidated, punished or otherwise suffer harm because they availed themselves of the judicial system. *See Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *United States v. Farrar*, 414 F.2d 936, 938 (5th Cir. 1969).

The insult that such retaliation against litigants or witnesses would produce goes beyond the injuries suffered by the individuals themselves: the integrity of the court's process and proceedings suffers the inevitable and intolerable destruction that accompanies any retaliation against the witnesses.

Witnesses who lose work opportunities, suffer harassment, and are otherwise retaliated against because of their testimony, are going to be much less likely to testify in a

subsequent proceeding (which is very probable in this case) if such retaliation goes unchecked. This would affect both the Court—hindering its ability to hear the full story—and the EEOC—hindering it in prosecuting the case.

■ The inherent power of a federal district court to prevent or remedy actions designed to or having the effect of deterring the use of the courts, or punishing one for such use, has been recognized and incorporated into the court's contempt power and its power under the All Writs Statute. 28 U.S.C. § 1651; *Pennsylvania v. Local 542, Int'l Union of Operating Engineers*, 347 F.Supp. 268, 286 (E.D.Pa.1972).

■ In the second place, the district court retains jurisdiction to preserve the status quo and protect its proceedings in all germane matters. A pending appeal, and similarly a stay, only deprives a district court of jurisdiction over those matters at issue in the appeal or stay. Here we are concerned with events transpiring subsequent to the trial of this case some three years ago, namely retaliation against witnesses who testified for the EEOC at that trial. Nor is it necessary to establish the underlying claim of general discrimination to prevail upon the retaliation issue. *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1005 (5th Cir. 1969); *EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66, 70 (S.D.N.Y.1975), *aff'd on opinion below*, 559 F.2d 1203 (2d Cir. 1977). In *Pettway*, the court of appeals found that retaliation charges are ancillary to the main issues in a case and should, partially because of the possibilities of a remand, be heard by the district court even while the main issues were pending appeal.

Jurisdiction also exists independently under Section 706(f)(2) of Title VII, 42 U.S.C. § 2000e–5(f)(2), which provides in pertinent part:

"Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission . . . may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. . . ."

■ In the instant case charges of retaliation were made by Perry McQueen, Hector Marr, William Joquin, Lester Stephenson and Herbert Screen and filed with the EEOC. (Exhs. A–E to plaintiff's moving papers herein). Also, a certification by the Deputy District Director of the New York District Office of the EEOC relating to the charges by the above-named individuals and requesting prompt judicial action was placed in evidence at the hearings in June 1977. (Pl. Exh. I). Furthermore, a finding of jurisdiction based on the aforementioned retaliation charges does not require the filing of a separate action on the retaliation issues: the retaliation action is ancillary to the main action. *Pettway, supra*, 411 F.2d at 1003.

■ Finally, this ancillary proceeding was not commenced until May 15, 1977, almost two months after the original decision of the appellate court directing the remand of the case to this Court. While the mandate was stayed by reason of the motions for reargument—therefore making it arguable whether the December 15, 1976 order of the court of appeals staying further proceedings in the district court remained in effect until the motions for reargument and reargument en banc were denied on August 18, 1977—the main case has now been remanded by issuance of the mandate on August 24, 1977. Thus, although this Court has concluded that it had jurisdiction to entertain this proceeding when it was instituted in May 1977, it cannot be disputed that any action by this Court at this time is no longer affected by the pendency of any appeal or of any stay entered by the appellate court.

### Retaliation

Since this Court has determined that it has jurisdiction, it must consider whether the evidence presents a case of retaliation against witnesses sufficient to permit the entry of preliminary relief against defend-

ant Local 15. The Court concludes that such relief is warranted.

Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), provides in pertinent part:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

■ In order to establish retaliation under Section 704(a) of Title VII, the plaintiff must establish three elements:

(1) protected participation or opposition under Title VII known by the retaliator;

(2) an employment action or actions disadvantaging a person or persons engaging in protected activities; and

(3) a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions.

*Hochstadt v. Worcester Foundation for Experimental Biology, Inc.,* 425 F.Supp. 318, 324 (D.Mass.1976); *see EEOC v. Kallir, Philips, Ross, Inc., supra,* 401 F.Supp. at 70; *Bradford v. Sloan Paper Co.,* 383 F.Supp. 1157, 1162–63 (N.D.Ala.1974).

■ The methods and burdens of proof in a Title VII retaliation case are no different than in any ordinary employment discrimination action. *See EEOC v. Kallir,*

*Philips, Ross, Inc., supra,* 401 F.Supp. at 70 & n.8, *and Brown v. Rollins, Inc.,* 397 F.Supp. 571, 578 (W.D.N.C.1974), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ The first element which must be established here is the existence of protected activities and Local 15's knowledge of same. That this element of a retaliation case has been met by the EEOC is beyond question. Testimony in court in a Title VII action and filing of EEOC charges, themselves alleging retaliation, are clearly what was intended to be meant by protected participation under section 704(a). *E. g., Pettway v. American Cast Iron Pipe Co., supra,* 411 F.2d at 1004–07. And it is equally clear that Local 15 had the knowledge of these protected activities without which the retaliatory motive which is a part of the first element cannot be made out. *Hochstadt v. Worcester Foundation for Experimental Biology, Inc., supra,* 425 F.Supp. at 324; *see Bradford v. Sloan Paper Co., supra,* 383 F.Supp. at 1162.

■ On the second element, the Court finds that the EEOC has clearly established an employment action or actions disadvantaging a person or persons engaging in protected activities.[1] In determining whether Local 15 has retaliated against members of that Union who testified on behalf of the EEOC in its action against Local 15 and others, the Court has looked to three areas: (1) Local 15's job referral practices; (2) Local 15's dues structure and suspension procedures; and (3) Local 15's admission practices.

---

1. The general background of Local 15 (and Local 14 to the extent pertinent) is familiar to the Court and is set out in its finding of facts in its opinion of May 6, 1976. *EEOC v. Local 14, Int'l Union of Operating Engineers,* 415 F.Supp. 1155, 1160–63 (S.D.N.Y.1976) (Findings 1, 3, 4, 6, 8–10, 13–16). Local 15 is governed by an executive board consisting of several line officers, business agents and representatives elected by the membership, which board purportedly has final responsibility for decisions such as

the admission of new members and the suspension, withdrawal and reinstatement of members. There is evidence, however, that in practice this board is merely an advisory group to the President/Business Manager, currently Thomas Maguire, Jr. In addition to Maguire, the principal members of the board are Daniel Murphy, Vice-President and business agent, James Stahl, Financial Secretary, Thomas Geraghty, Corresponding Secretary and business agent, and Frank Guma, business agent.

*Local 15's Job Referral Practices*

At the time of the original trial in this action, September 1974, Local 15 operated a job referral system for its members which was described by this Court in its opinion of May 6, 1976:

"(31) Local 15 runs a hiring hall, known as the 'hall' or the 'day room'. Employers and employees rely heavily on the Union for job referrals, 30% of the members of Local 15 using the 'day room' with the remaining 70% steadily employed. Work assignments are not customarily made on a first come, first served basis, but rather are made in the order in which an individual has signed the list. However, a new list is made up each week, so that someone who has been waiting for a job for four weeks may go to the bottom of the list. Also, a man does not necessarily sign the list in the order that he entered the 'hall'. In signing the list he sets down his name and the equipment he can operate. He also may indicate his Union affiliation, if any, or whether he is a 'permit man'. In making the work assignment, the decision of the business agent is based upon subjective rather than objective criteria. Although there is no credible evidence of deliberate discrimination in the referral procedures over recent years, there is not sufficient information made available to nonunion applicants, particularly minorities. Unless a man writes down the length of time he had been unemployed, this fact would play no part in his eligibility for assignment. The business agents know only a few hundred members, and usually can only rely on a limited knowledge of a man's skill. They know few minority 'permit men' and generally require them to be tested, which may mean no referral.

This system of giving work to Union and nonunion men on the basis of the subjective, discretionary decisions of business agents, unsupported by objective and fair tests or criteria, or even by personal observation with respect to the job skills in question, and often the result of ignorance or personal preference, operates to the disadvantage of minorities." *EEOC v. Local 14, Int'l Union of Operating Engineers, supra,* 415 F.Supp. at 1165–66 (Finding of Fact 31).

The structure and operation of Local 15's referral system remained essentially unchanged from the time of the original trial until November 1, 1976, the effective date of the hiring hall procedures established under the order of this Court designed to eliminate the discriminatory effects of the old referral system.[2] Thus, until November 1, 1976, Local 15 business representatives retained and exercised the power to refer men out of order from the list and to honor employer requests for specific individuals.[3]

Plaintiff's evidence herein, virtually unchallenged, shows that the effect of this referral system was to deprive those who testified for the EEOC at the first trial of the opportunity to find work.

There would appear to be no question that the EEOC witnesses suffered a sharp diminution in their earnings following their testimony in 1974. Restricting consideration to the five witnesses who filed retaliation charges with the EEOC, *i. e.,* McQueen, Marr, Joquin, Stephenson and Screen, the Court finds that: McQueen earned $13,-636.72 in 1974 and only $83.60 in 1975; Marr earned $14,324.33 in 1974 and only $1,074.80 in 1975; Joquin earned $9,422.13 in 1974 and nothing in 1975; Stephenson earned $17,040.33 in 1974 and only $2,858.48

2. During the period from September 1, 1976, the date of this Court's order, until November 1, 1976, the hiring hall operated under the last list prepared prior to September 1, which was preserved and used with new names being added to the bottom.

3. From November 1, 1976 until the stay of this Court's order by the court of appeals on December 15, 1976, the hiring hall procedure adopted by the Court-appointed administrator was in effect and referrals were on a first-in first-out basis as defined in this Court's order of September 1, 1976 and the administrator's decisions pursuant thereto.

in 1975; and Screen earned $10,036.37 in 1974 and nothing in 1975. (Pl.Exh. 19). Three other witnesses for the EEOC who have not filed retaliation complaints also suffered a sharp diminution in wages after testifying at the main trial. Thus, Arthur York who earned $10,406.46 in 1974 only earned $2,388.19 in 1975; Robert White who earned $20,392.97 in 1974 earned $7,064.20 in 1975; and Jose Sotelo who earned $14,610.99 in 1974 earned $7,008.63 in 1975. While a decline in the construction industry was undoubtedly responsible for some decline in wages received, it is significant that the mean earnings of the witnesses for the EEOC declined from the year of the trial, 1974, to the first full year after the trial, 1975, by a higher percentage than the mean income of the witnesses who testified for Local 15. (Pl.Exhs.19 and 20). No witnesses for Local 15 who showed income in 1974 on the defendant's earnings tabulation (Pl. Exh. 10) declined to less than $5,300 of income in 1975. Fourteen of the twenty-five Local 15 witnesses had 1975 incomes over $9,000 as compared to one of seventeen EEOC witnesses. (Pl.Exhs. 19 and 20).

 This serious reduction in income occurred notwithstanding the effort of the EEOC witnesses to obtain work through the Union. The witnesses—ready, willing and able to work—went down to the hiring hall for extended periods of time, often on a daily basis, but were virtually unable to obtain referrals from Local 15 in the normal manner. (Hector Marr Tr. 19, 23; Lester Stephenson Tr. 41–42, 54–55; Perry McQueen Tr. 154, 161–63; William Joquin Tr. 202–05). Stephenson and Joquin testified that they saw men no more qualified than themselves go out repeatedly on jobs while they stayed in the hiring hall. Some EEOC witnesses testified that the only way they were able to obtain jobs was by recourse to outside agencies such as the New York City Commission on Human Rights or the New York Plan. The discrimination and retaliation against the EEOC witnesses is borne out further by the hiring hall lists

compiled under the September 1, 1976 order (Pl.Exhs. 7 and 8), and the earnings tabulation of witnesses prepared by Local 15 (Pl. Exh. 10). Moreover, those EEOC witnesses who signed the hiring hall list were twice as likely as Local 15's membership and trainees to have had only 10 weeks or less work in the 22 months from January 1, 1975 to October 21, 1976. It is significant that only one EEOC witness had over 50 weeks of work in that time but almost 200 Local 15 non-witness members had over 50 weeks of work. There is no evidence to rebut a conclusion that the differences in amount of work and income were a direct consequence of the EEOC witnesses' status as witnesses. Failure of a union to refer members to work because of their protected activities violates Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a). *Dobbins v. Local 212, International Brotherhood of Electrical Workers, AFL–CIO,* 292 F.Supp. 413, 445 (S.D. Ohio 1968).

*Local 15's Dues Structure and Suspension Procedures*

It is also clear that Local 15 has used its dues and suspension powers against several of the EEOC witnesses in a manner inconsistent with the Union's stated policies. Dues are payable for each quarter on or before the first day of that quarter in alternating amounts of $36 and $46. The Constitution of the International Union of Operating Engineers permits but does not compel Local 15 to suspend members for non-payment although there appear to be no written by-laws or executive board minutes on suspension or withdrawal. Suspension is defined by Local 15 as the loss of all privileges and benefits of membership. Withdrawal is similarly defined but differs from suspension in the payments necessary for reinstatement and the retention of death benefits. Local 15 is unclear as to whether there is an absolute right to reinstatement after suspension, but it appears that the executive board exercises considerable discretion.

The conditions for reinstatement from suspension apparently are payment of all back dues, including those for the period of suspension, payment of the current quarter's dues and a vote of the executive board. Members seeking withdrawal may do so by requesting a card from the Local. Thereafter they may be reinstated by paying $10 for each year of withdrawal and obtaining an affirmative vote of the executive board after the board has considered the economic state of the industry. A former condition for withdrawal—that the member be paid up in his dues—was eliminated in February 1977, although this change was neither reflected in the minutes of the executive board nor officially communicated to the members.

Local 15 has no fixed policy regarding the suspension of members for non-payment of dues. Although Maguire testified that it was the policy to suspend all members who owed three or more quarters of dues, there is evidence of a policy not to suspend out-of-work members. According to Maguire, a member in default gets notices after the first, second, and third quarters of non-payment and may be referred out, at a business agent's discretion, to one day or more of work to enable him to pay up his dues.

Contrary to the stated policy as to all persons owing three or more quarters' dues, an analysis of the records shows that of those potentially liable to suspension as of March 30, 1977, only 11% were actually suspended by May 19, 1977. Local 15's records as of March 30, 1977 show 64 members three or more quarters behind in their dues as of that date. Of these, 57 were three quarters behind and seven were four quarters behind. However, as of May 19, 1977 only four of the 57 who were three quarters behind and three of the seven who were four quarters behind were listed as having been suspended. Three EEOC witnesses have been suspended since the original trial while others have been forced to pay their dues out of unemployment benefits, vacation funds, or earnings from jobs received outside the Local 15 referral system in order to avoid suspension.

Moreover, EEOC witness Stephenson was threatened with suspension when he owed dues for only one quarter. EEOC witness McQueen received his first notice for non-payment of dues on or about February 18, 1977. McQueen made fruitless attempts at a meeting with the executive board to get a referral to significant work. He did not hear from Local 15 until April 29, 1977, two days after service of his EEOC charge of retaliation. At that time he received a telephone call from a Local 15 business agent in which he was told he would be suspended on May 2, 1977 if he did not pay his dues. He was also told that whether he was put "on hold" (withdrawal) or suspended, at best he would get only one or two days work to pay his dues. McQueen said that if he did this he would lose three weeks of unemployment insurance. On or about May 6, 1977 McQueen was advised he was suspended as of May 11, 1977, at which time he was four quarters in arrears. In the absence of referrals from Local 15, McQueen has had to support himself and his family on unemployment benefits and has twice been evicted.

This application of dues and suspension practices by Local 15 to EEOC witnesses is a violation of section 704(a). First, disciplinary action taken after learning of protected activities, to the extent that it varies from stated procedures or from the action taken with respect to those not involved in protected activities, violates that section. *Francis v. American Tel. & Tel. Co., Long Lines Dep't,* 55 F.R.D. 202 (D.D. C.1972). Moreover, even if Local 15 had a completely neutral dues and suspension policy and enforced it fairly, the application of such a system to the EEOC witnesses would still have the effect of perpetuating the discrimination in the referral system and the denial of work opportunities suffered by those witnesses. Having denied those witnesses work, Local 15 cannot then suspend them when they cannot pay their dues.

*Local 15's Admission Practices*

There also appears to have been discrimination in Local 15's admission practices against Jose Sotelo, an EEOC witness. Since October 1974 at least 100 persons have become new members of Local 15, yet Sotelo could not become a member until late May 1977 because, as he was told by Maguire, his admission was tied up because of the main court action. Herbert Screen, an EEOC witness, has been denied membership in Local 15.

██ ·That the motive of Local 15 in its action directed against EEOC witnesses is retaliatory seems clear. As brought out in the prior trial, there were at least two meetings of Local 15 at which derogatory comments were made about the EEOC witnesses or where members were advised not to answer EEOC questionnaires. A business agent told Marr just before the prior trial that things would go badly for him if he went against Local 15, and after Marr testified things did go badly. (Marr's earnings of $14,324.33 in 1974 dropped to $1,074.80 in 1975). The record discloses instances where Local 15 officials indicated they would not help EEOC witnesses with their problems. The argument that Local 15 must suspend non-dues-paying members for economic reasons flies in the face of the fact that, in a given period of time, only 11% of the potential suspension cases suffered suspension.

██ It seems clear that the principal cause of the loss of work opportunities and income, of the dues problems suffered by certain of the EEOC witnesses, of the delay in the admission of Sotelo, and of the suspension of McQueen was the active effort of Local 15 to penalize these persons for having testified at the prior trial.

██ Accordingly, Local 15, its officers, agents, employees, successors, assigns, and all other persons in active concert or participation with them are preliminarily enjoined, pursuant to Rule 65 of the Federal Rules of Civil Procedure, from harassing, intimidating, demoting, suspending, discharging or in any other way discriminating against any person because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing authorized by Title VII. More particularly, Local 15, its officers, agents, employees, successors, assigns and all other persons in active concert or participation with them are ordered not to suspend Perry McQueen, Hector Marr, William Joquin, Lester Stephenson and not to refuse Herbert Screen membership (if not already admitted and if otherwise qualified) because of their assertion of rights protected by Title VII. Defendant Local 15, through its President, Thomas Maguire, is ordered to communicate to each and every active member by written notice the existence of the instant preliminary relief and to state that Local 15 has been ordered to take no further retaliatory action against any member who exercises his rights under Title VII. Local 15 shall refrain from discriminating against Perry McQueen, Hector Marr, William Joquin, Herbert Screen and Lester Stephenson in referral to gainful employment, and the matter is referred to United States Magistrate Harold J. Raby to hear and report on all other actions necessary to make whole these individuals for all losses caused by the unlawful termination or denial of their employment or membership, including but not limited to loss of wages, medical and vacation benefits, and owed union dues.

So ordered.