Neil Abraham **BRADINGTON** a/k/a Niel
Abraham **Brad** a/k/a Mohamed Mo-
hamed Ibrahim Barad

v.

**INTERNATIONAL BUSINESS MA-
CHINES CORPORATION, a New
York corporation.**

**Civ. A. No. 20700–N.**

United States District Court,
D. Maryland.

May 18, 1973.

As Amended June 5, 1973.

Neil Abraham Bradington, pro se.

J. Hardin Marion, Baltimore, Md., for defendant.

NORTHROP, Chief Judge.

This case concerns the tragic denouement of a scientist's promising career. The scientist, Dr. Neil Abraham Bradington, who is the plaintiff in this suit, has instituted action against International Business Machines Corporation (IBM) under 42 U.S.C. § 2000e–2, alleging a discriminatory discharge from employment on the basis of plaintiff's race, religion, color, and national origin. After a protracted pretrial · period, laden with myriad discovery motions, this cause came before the Court for trial on April 16, 1973.

Plaintiff is a naturalized American citizen of Egyptian origin, and a member of the Islamic faith. In the summer of 1965, defendant IBM hired the plaintiff for the position of advisory engineer and assigned him to its Space System Center in Bethesda, Maryland. On December 14, 1967, plaintiff was discharged by the defendant corporation. He contends that his discharge was a re-sult of discrimination based on his race, color, religion, and national origin and complains of systematic, continuous, and malicious discriminatory practices. Plaintiff further contends that he suffered severe and permanent emotional and physical injuries, and that he has been unable to find meaningful employment since his discharge. He seeks reinstatement and $500,000 in damages.

Defendant counters with a denial, claiming that the discharge was a result of inadequate performance of duty "for failure to meet performance standards for the position to which he was assigned by his management."

The issue that this Court must decide is whether there was a concerted effort by some of defendant's employees to ease plaintiff out of IBM under the pretext of inefficiency. In other words, were IBM's reasons for the discharge pretextual and really motivated by discriminatory intent.

## FINDINGS OF FACT

The plaintiff was born on September 24, 1926 in Tanta, Egypt, under the name of Mohamed Mohamed Ibrahim Barad. He received his formal education in Egypt, and in 1945 graduated from the University of Cairo with a Bachelor of Science degree (with honors) in physics and mathematics. He continued to study science at the same university where, in 1951, the degree of Bachelor of Science (with honors) was conferred upon him in chemistry and biology. He went on to do graduate work and obtained a Ph.D. in biochemistry at the University of Cairo in 1956, where he was also a lecturer in biochemistry.

That year (1956) he became President of Brad Industrial, Agricultural and Chemical Organization, a business enterprise for the manufacture and distribution of chemicals, pharmaceuticals, industrial, agricultural, medical and scientific equipment. The company was dissolved in 1958 when he joined the faculty of the Khartoum Technical Institute in Khartoum, Sudan Republic, as a sen-

ior lecturer in electrical engineering and applied physics.

In 1960, he emigrated to the United States and changed his name to Neil Abraham Brad. He enrolled at U.C.L.A. where he received another PhD., in Plant Science, in 1964. During his tenure at U.C.L.A. he became Curricula and Academic Director of Northridge Military Academy, Northridge, California. For a short period he also became Principal Systems Engineer for Consolidated Systems Corporation in Monrovia, California. After that, he took temporary positions with the Pediatrics Department and Plant Biochemistry Department at the University of California.[1]

In the early part of 1965 the defendant IBM placed an advertisement in the Los Angeles Times, offering various employment positions for scientists and engineers. The plaintiff, Dr. Bradington,[2] became interested in a position with IBM, as advertised. He responded to the advertisement, and an appointment was scheduled for him to meet with Mr. Sidney Shapiro, an IBM interviewer. Mr. Shapiro determined that Dr. Bradington's background highly qualified him to work on one of IBM's major projects in the Advanced Space Program. Mr. Shapiro stated in the Applicant Appraisal Form that he was "very impressed with his [Bradington's] enthusiasm."

Plaintiff was subsequently interviewed by Dr. Gilbert Anthony, Manager of the Orbit Research Laboratory Project (ORL) in the Advanced Space Program, the project to which plaintiff would be assigned. Dr. Anthony was also impressed with Dr. Bradington, stating that his biochemistry background gave him an "excellent qualification for the ORL Project." Dr. Anthony also determined that the plaintiff was "extremely motivated."

Dr. Peter A. Castruccio, Chief Scientist of IBM's Space System Center and Director of the Advanced Space Program in Bethesda, Maryland, then recommended that the plaintiff be hired. On July 1, 1965, Dr. Bradington was offered a position as an advisory engineer in the Advanced Space Program at a salary of $17,484. He accepted the position and his employment in Bethesda, Maryland became effective as of August 30, 1965.

Plaintiff began to experience difficulties almost from the start. In the Fall of 1965, as expected, he was assigned to work on the Orbit Research Laboratory Project, under the direction of Dr. Nomicos. Dr. Bradington and Dr. Nomicos developed a personal friction and could not get along. They disagreed on every phase of the technical direction of the project. As a result of this friction plaintiff's management determined that he could no longer participate in the ORL Project. Dr. Gilbert Anthony, the project manager, requested Dr. Bradington to put his thoughts on the Project on paper for his successor. Instead of doing that, plaintiff submitted a letter to Dr. Anthony complaining about Dr. Nomicos.

In late December plaintiff went to the West Coast and was assigned the task of preparing his version of the ORL Report. His report was due January 1, 1966 and he did not meet the deadline. In addition, he hired unauthorized stenographic help in Los Angeles where IBM has a facility. Dr. Lorraine Gall, a scientist in the same program hired at the same time plaintiff was hired, was also asked to write a report on the ORL Project. When both reports were completed they were submitted to Professor Hanson, a biochemist at George Washington University, for independent study. Dr. Hanson determined that Dr. Gall's report was the better of the two. Dr. Peter Castruccio, the Center's Chief Scientist, expressed preference for Dr. Bradington's report. The customer,

---

1. During this period he had five different articles published in various scientific journals.

2. Although plaintiff's present name is Dr. Bradington, at the time of his employment with IBM, his name was Dr. Brad.

Maurice Raffenberger, preferred Dr. Gall's approach. Thus, plaintiff's active participation in the ORL Project ended.

In January, 1966, Dr. Bradington was assigned to work on the Apollo Application Project with Dr. Gall. Considerable professional jealousy developed between the two and they could not get along.

On May 11, 1966 Dr. Gilbert Anthony submitted his appraisal of Dr. Bradington's performance. On a scale of one to nine plaintiff was rated two. That meant, however, that he still met minimum requirements. Dr. Anthony stated that plaintiff's work was neither productive nor useful, and required an inordinate amount of management attention. Dr. Anthony nevertheless stated that he still believed Dr. Bradington to have "excellent potential," that he must "straighten out divergent viewpoints with colleagues," and that his "new assignment may hopefully result in a better rating in the future."

In response to Dr. Anthony's appraisal Dr. Bradington submitted a comment stating that the appraisal was "unfounded, biased, and prejudiced," that "because I had certain scientific disagreements with my immediate management and since my point of view proved to be right, the attitude of my management became obviously more hostile . . . . [M]anagerial authority has been misused to give deliberate misleading or wrong instructions, to abort my work before fruitful completion, to suppress my morale and to break down my spirit and to assign tasks that are practically impossible."

The new assignment referred to by Dr. Anthony in his appraisal had begun on an informal basis the previous month, in April, 1966. That month the Natural Resources Department was created, to be headed by Dr. Michael Del Duca. The two exchanged thoughts and Dr. Bradington expressed an interest in the new department. He joined the department on an informal basis that month.

Following Dr. Anthony's appraisal of plaintiff's performance, Jane Cahill, presently a Vice President of IBM and then Personnel Manager of the Space System Center, reviewed plaintiff's work as well as his complaints. She found his work unsatisfactory and reported that plaintiff "evidences a feeling of persecution." After meeting with Drs. Anthony and Castruccio it was determined that Dr. Bradington was not meeting management's expectations. Miss Cahill met with the plaintiff and told him that he was being put on probation. She indicated to him that if managment continued to be dissatisfied with his work, his employment relationship with IBM would have to be severed. Dr. Bradington was then formally transferred to Dr. Del Duca's new department.

From June to November of 1966 plaintiff's performance showed a marked improvement. On November 18, 1966, a second appraisal of Dr. Bradington's performance was submitted, this time by Dr. Del Duca. Dr. Del Duca rated the plaintiff as a seven on the same scale of one to nine. Dr. Del Duca stated that "after a period of adjustment with IBM, I feel Dr. Bradington is becoming an effective element of the Company. If his present efforts and self improvement continue, he has great potential for IBM." Dr. Castruccio lowered that rating to a five stating that plaintiff's performance prior to joining the Natural Resources Department must be taken into consideration. Moreover, Dr. Del Duca testified that he deliberately inflated plaintiff's rating because the latter had told him how important the appraisal is to him. Dr. Del Duca said he wanted to encourage and motivate Dr. Bradington and thereby give him an incentive.

It is also noteworthy that even though Dr. Bradington's performance improved in the latter half of 1966, management was displeased with two of his actions. Plaintiff, without authority, invited Dr. David Grove, chief IBM economist, to the Center in Bethesda to examine the project. He also invited Lord Howick, a representative of Britain's Agency for

International Development. Both invitations were believed by management to be manifestations of poor judgment.

On December 30, 1966 Dr. Bradington met with Dr. Castruccio and complained that IBM had not promoted him in spite of his hard work and good results. Dr. Castruccio reminded plaintiff of his initial difficulties in the Company. He further advised him that he should concentrate on continuing his good efforts in the future and would subsequently receive a higher rating. Dr. Bradington's progress and success was short-lived. In January, 1967, he went on vacation. When he returned he was informed of a salary increase. He became irritated with the increase believing it to be insufficient. According to Dr. Del Duca, Dr. Bradington's attitude changed markedly. He appeared irritated, aggravated, and displeased.[3] He began to complain about his co-workers, questioning their competency and accusing them of plagarizing his work.

In February, 1967, Dr. Bradington was assigned to work on a new project: The Applicability of Space Generated Technology to the Technological Needs of Developing Nations, specifically to the socio-economic needs of Brazil (hereinafter referred to as the Brazil Proposal). Plaintiff's changed attitude manifested itself in his work, which began to exhibit erosion. Plaintiff was the Proposal Manager and was therefore responsible for the preparation of the proposal report. According to Dr. Jerry C. McCall, Manager of Special Planning, the Proposal was ill-prepared, oversimplified, and lacked analytical depth. Dr. Castruccio testified that the report was not inadequate, but neither was it very good. It was acceptable at best. He stated he had to spend many hours to improve it.

It was decided that as is customarily done, Dr. Bradington would be Proposal Manager, and another scientist, Dr. Greg Butterworth would be Project Manager. Plaintiff disagreed with that, but finally relented. Then, acting in direct contravention to his superior's instruction, he submitted his own name as Project Manager. The Brazil Proposal was thus submitted to the National Aeronautics and Space Administration (NASA). IBM management decided to leave the plaintiff as Project Manager lest it would be embarrassed by having to explain to NASA the "mistake." Dr. Castruccio informed Dr. Bradington that the insertion of his name as Project Manager was an act of insubordination.

Because plaintiff was now Project Manager he would have to prepare an Oral Presentation of the Brazil Proposal to be given to NASA on April 28, 1967. Dr. Bradington was instructed to prepare a memorandum with answers to anticipated questions. Plaintiff did not follow these instructions. For example, Dr. Castruccio told plaintiff that it would be a good idea to show how the proposal would apply to a particular Brazilian industry such as rubber. That precise question was asked at the presentation and Dr. Bradington handled it poorly. According to Dr. Castruccio, plaintiff's presentation was naive and lacked logical cohesion. According to Dr. Del Duca, the presentation was "embarrassing and a disaster." The proposed cost of working on the project was $3,000.00. Plaintiff utilized resources to the extent of $12,000.00. And the proposal was not accepted by NASA. A contract was awarded to an IBM competitor.

A week before the Oral Presentation on the Brazil Proposal, on April 19, 1967, plaintiff first complained of discrimination on the basis of his national origin, with a short letter to Dr. Castruccio.[4] On May 15, 1967, Dr. Castruccio discussed plaintiff's April 19th

3. Dr. Bradington apparently became displeased with a number of unwanted tenants who resided in a dwelling located on a tract of real property which he owned in California.

4. The letter read as follows:
It is my opinion that my capabilities and experience are not effectively utilized for the maximum benefit of IBM, and that obstacles are placed to impede

letter with him. Dr. Castruccio asked Dr. Bradington for documentation of his discrimination claim. Dr. Bradington cited three examples. He said that Dr. McCartney, a fellow IBM scientist, once asked him "how come you are an Egyptian and yet know so much about international affairs"; that Dr. Butterworth once showed him a picture of a camel in distress and commented on Egypt's transportation system; and that he was being denied sufficient resources to do his job. Dr. Castruccio indicated that in the absence of any other evidence it is unlikely that plaintiff's performance is being impeded by any discrimination.

Dr. Bradington was also told by Dr. Castruccio and his other superiors to discontinue further work in connection with the Brazil Proposal. Plaintiff knowingly disregarded these instructions and initiated correspondence with Dr. Paul De Goes, scientific attache at the Brazilian embassy. He also went to the Brazilian embassy to engage in discussions related to said project.

Plaintiff was then assigned to the Voyager Program. That program was concerned with detecting life on the planet Mars, research work which, it was believed, would be ideally suited for plaintiff, a biochemist. Dr. Bradington could not come to an agreement with that project's manager, Dr. Robert D. Van Buiten. Plaintiff said he would be willing to do the work on the project but would refuse to devote full time to that project.

Plaintiff spent part of June and July, 1967, in a hospital undergoing a tympanoplasty operation. In late July, 1967, Dr. Bradington met with Arthur Cooper, Executive Manager of the Space Program to discuss the discrimination charges. Cooper directed an independent investigation of the charges as well as an appraisal of plaintiff's work, by Arthur Stenberg, Personnel Manager of the Space System Center (Stenberg succeeded Miss Cahill in October, 1966, who took a leave of absence), and by Jerry C. McCall, Manager of Special Planning, respectively. Their investigation revealed that plaintiff's charges were unfounded and lacked any substance. Plaintiff's work also demonstrated erosion and deterioration. In August, 1967, Dr. Bradington was asked to assume duties in the Maryland Water Management Plan. He was dissatisfied with that task. In the same month Dr. Castruccio and Mr. McCall recommended that plaintiff's employment be terminated. Mr. Stenberg disagreed, believing that Dr. Bradington was a capable scientist. Mr. Cooper decided not to discharge the plaintiff yet. He intended to undertake further efforts to find suitable work for Dr. Bradington.

In September, 1967, a third appraisal of Dr. Bradington was undertaken by Dr. Del Duca who had given him a seven rating in November of 1966. This time Dr. Del Duca rated plaintiff as one, the lowest possible rating. He found that Dr. Bradington's performance deteriorated noticeably, that he showed a total disregard for management direction, and demonstrated a lack of judgment.

On September 20, 1967, Cooper indicated to Dr. Bradington that he was more suited to a research-oriented academic environment, as opposed to the industrial and competitive environment of IBM. Dr. Bradington stated he wished to stay with IBM. The following day plaintiff was hospitalized for hernia surgery.

In November, 1967, IBM was informed that the University of California was seeking candidates for a teaching position in the bioscience area. It was

my ability to bring revenue to the department.
It is my belief that such obstacles are deliberate and planned.
It is my contention that this subtle attitude is motivated by the knowledge of my being born outside U.S. ↵

I certainly appreciate discussing this matter with you at your convenience in order to arrive at a solution that permits me to be productive.

(signed Neil A. Brad.)
Neil A. Brad

suggested that this be brought to the attention of Dr. Bradington. He returned to work on December 4, 1967. It was suggested to him that he look for another position with the aid of IBM and that he be retained on the payroll until he found one. Plaintiff refused the offer saying he wanted to stay with IBM. An assignment under Drs. Gall and Medin was suggested to him. He was unwilling to accept the assignment, questioning the ability of Drs. Gall and Medin to assess his work. Moreover, he refused to be held responsible for his work product.

Dr. Bradington was finally discharged on December 14, 1967.

Additional facts must be related to complete the picture in the chronological framework heretofore presented. Plaintiff introduced into evidence a copy of a letter he allegedly wrote on November 22, 1965, less than three months after he commenced his duties with IBM. The letter states that the plaintiff had been forced to work hundreds of hours of overtime, during weekends and holidays; that he had been denied access to references pertinent to his assignments; that he had been isolated from his colleagues and co-employees; that he was prevented from having lunch breaks; that he had been forced to relieve his needs by the use of paper cups because he was not provided with a key to the locked rest room; that deliberate attempts were being made to cast doubt upon his professional capacity. The letter goes on to recite innumerable examples of harsh and unfair treatment, all because of the "discovery of being Arab Egyptian Moslem."

All of the witnesses who testified in behalf of IBM, who were intimately associated with Dr. Bradington and his work, unequivocally and categorically denied ever having seen that letter. Mr. Anthony and Dr. Castruccio testified that the first time plaintiff complained of discrimination on the basis of his national origin was in the April 19, 1967 letter. The note they read in November of 1965 directed its remarks at plaintiff's inability to perform under Dr. Nomicos' direction in connection with the ORL Project. As soon as Dr. Bradington complained of racial and religious discrimination in 1967, his complaint was referred to his personnel superiors for an investigation. Under IBM's Open Door Policy any serious complaint may ·be reviewed by succeeding officers up the ladder of IBM's chain of command. No discrimination charges were reviewed by any IBM officials in 1965 in connection with Dr. Bradington. Defendant's counsel asserts that plaintiff wrote that letter after his discharge in 1967 and pre-dated it to lay a foundation for his suit. Plaintiff asserts that the defendant is deliberately pleading ignorance of the letter to dissuade the Court from finding a connecting link between the letter and plaintiff's subsequent difficulties at IBM.

The facts reveal that many of the plaintiff's difficulties were generated by his disregard of instructions and his excessive demands on management. Although plaintiff might have written that letter in November, 1965, there was absolutely no indication that he ever actually submitted it to IBM.

It is true that plaintiff complained about having no key to the rest room and about having an inferior office. But it also appeared that these were isolated incidents that were not biproducts of discrimination and as one of the witnesses, Mr. David Hammers, Manager of Employee Effectiveness, aptly stated in a memorandum, "Dr. Brad[ington], in my opinion, makes mountains out of mole hills."

Plaintiff has also claimed that during his initial interviews, Mr. Shapiro spoke to him in Hebrew and Mr. Anthony inquired about his Egyptian background. Mr. Shapiro testified that he cannot speak a word of Hebrew and Mr. Anthony denied plaintiff's allegation. These witnesses' Applicant Appraisal Forms reveal that, as has been previously related, they were impressed with Dr. Bradington's credentials and recommended him highly. Surely, if they were biased

on account of the plaintiff's national origin, they could have chosen not to recommend him for the position. Again, it is possible that a reference to his background was made during these interviews, but to inflate these references to inquiries characterized by discriminatory overtones would defy any logic in view of the high recommendation Dr. Bradington received.

Dr. Bradington was not the only person of foreign extraction in the Bethesda IBM facility. As a matter of fact, Dr. Castruccio testified that that facility is known as IBM's United Nations. The reason therefor is the close proximity of the branch to the nation's Capitol, and its work for customers which prefer the "foreign flavor" touch in the proposals. Some of the foreign nationals who worked in the same center with the plaintiff were: Dr. Castruccio, of Italian origin; Dr. Nomicos, of Greek origin; Dr. Fu, of Chinese origin; Dr. Treupel, of German origin; Dr. Pocalyko, of Ukrainian origin; and last but not least, Dr. Mansur Arbabi, of Arabic origin.

On December 18, 1972, Dr. Bradington was convicted of shoplifting in Montgomery County, Maryland. Plaintiff stated that the conviction was "just another harassment tactic against me by IBM." He, in effect, claimed that defendant IBM conspired to entrap him in that regard. He offered no evidence in support of this unique and highly conjectural theory. In addition, plaintiff has claimed that he has been followed by IBM for the past five years. Again, absolutely no evidence was introduced to that effect.

## CONCLUSIONS OF LAW

The Civil Rights Act of 1964, Title 42, United States Code, Section 2000e–2 provides in relevant part as follows:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

. . . . . .

(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

The Act only prohibits discriminatory employment practices based upon race, color, religion, sex, or national origin. E. g. Andres v. Southwestern Pipe, Inc., 321 F.Supp. 895, 898 (N.D.La. 1971) aff'd, 446 F.2d 899 (5th Cir. 1971). Congress has thus expressly mandated the removal of these specific discriminatory barriers to employment. Green v. McDonnell Douglas Corp., 463

F.2d 337, 343 (8th Cir. 1972). Whether a defendant has engaged in such discriminatory practices is essentially a question of fact to be resolved on a case by case basis. Frockt v. Olin Corp., 344 F.Supp. 369, 370 (S.D.Ind.1972), United States by Clark v. H. K. Porter Co., 296 F.Supp. 40 (N.D.Ala.1968).

■ Generally, where a person who fits one or more of the statutory categories, has been denied a job, but possesses the qualifications to fill the opening, he has presented a prima facie case of discrimination and the burden of proof shifts to the employer to demonstrate a substantial relationship between the reasons offered for denying employment and the requirements of the job. Green v. McDonnell, *supra*, Witherspoon v. Mercury Freight Lines, 457 F.2d 496 (5th Cir. 1972).

■ This is not such a case. The defendant here had determined that the plaintiff did possess the necessary credentials for the employment position offered. Plaintiff contends that his discharge was a result of discrimination. In order to prevail in such a case, the plaintiff has the burden of showing by a preponderance of the evidence that his employer had intentionally discriminated against him. Andres v. Southwestern Pipe, Inc., *supra*, Frockt v. Olin Corp., *supra*. To show intentional discrimination plaintiff must prove that the discriminatory practice was not accidental, inadvertent, or heedless, or that it arises from a mistake. United States by Clark v. H. K. Porter, *supra*.[5] It is also recognized that even if discriminatory motives constitute only a partial basis for the employer's action, it cannot be sanctioned. *See* Smith v. Sol D. Adler Realty Co., 436 F.2d 344 (7th Cir. 1970), Armstead v. Starkville Municipal School Dist., 325 F.Supp. 560 (N.D.Miss.1971),

Stebbins v. Keystone Ins. Co., 2 FEP Cases 861 (D.D.C.1970). Plaintiff, however, has not only failed to demonstrate any discriminatory intent or motivation in this case, but he failed to establish any discrimination in fact.

Plaintiff asserts that there was a subtle undertaking on the part of the defendant to create conditions leading to the final dismissal of the plaintiff, and that IBM management placed a number of subtle obstacles in his way to impede his productivity. In attempting to prove this claim plaintiff has consistently asked this Court to give him special deference because he is a *pro se* litigant, unfamiliar with the intricacies of litigation.

An attorney's assistance is indeed a necessary ingredient of effective representation in any litigation. The preparation to try a particular issue can trigger mental processes as to strategy in building documentary and testimonial proof. That is the art of advocacy. This Court has, therefore, taken special care in reviewing the testimony advanced by the plaintiff, who conducted the case without the aid of counsel.[6]

The Findings of Fact reveal that the plaintiff alone was responsible for his predicament. For reasons which are beyond this Court's analytical powers, plaintiff appears to have exhibited a total lack of cooperation and rapport with the other scientists and employees. His lack of cooperation manifested itself in a negative attitude and a hostile disposition which resulted in poor productivity. Management was constantly required to devote an inordinate amount of time to Dr. Bradington's efforts. Except for five months during the two year period he was with IBM, Dr. Bradington failed to meet the performance standards that were expected of him. He was given

---

5. Intent may, of course, be inferred from a defendant's conduct. *E. g.*, United States v. Central Motor Lines, 4 EPD ¶ 7624 at 5459 (W.D.N.C.1971).

6. Pursuant to a recommendation of the EEOC, this Court appointed counsel for the plaintiff. Plaintiff subsequently requested his court-appointed attorney to withdraw from the case, and decided to conduct the case *pro se* voluntarily.

numerous opportunities to improve his work. Yet, the evidence is overwhelming that he simply failed to respond to these opportunities. Plaintiff could not acclimate himself to the competitive milieu at IBM. Whether this is because he was suffering from a persecution complex, as Miss Cahill, the personnel manager suggested, is beyond the knowledge of this Court. It is clear, however, that far from being an exemplary employee, plaintiff was an inadequate performer. *See* Francis v. American Tel. and Tel. Co. Long Lines, 55 F.R.D. 202 (D.D.C. 1972).

■ Quite possibly, Dr. Bradington's difficulties may have arisen from a personality conflict which developed in the industrial atmosphere at IBM. Plaintiff, up to that point, had been for the most part engaged in academic endeavors in the pursuit of his career. This personality conflict generated antipathy and professional incompatibility which might have made it more difficult for the plaintiff to perform. But this certainly does not translate into discrimination. An employer is not required to like his employees. "No federal statute prohibits discrimination per se; rather, what is prohibited is discrimination that is racially [or on the basis of color, religion, sex or national origin] motivated." Richardson v. Hotel Corp. of America, 332 F.Supp. 519, 521 (E.D.La.1971).

Dr. Bradington spent many court hours challenging IBM's work procedure, program administration, project structuring, and allocation of funds, in connection with every undertaking that was entrusted to him. He, in effect, disagreed with many of IBM's employment policies and assignments. No matter how meritorious his view, it does not justify imputing discrimination to IBM's personnel. The criteria IBM utilized to judge Dr. Bradington's performance was standardized. It was not subjective criteria which merely masked aspects of prohibited prejudice. *See* Green v. McDonnell Douglas Corp., *supra*, 463 F.2d at 343. Plaintiff's blatant disregard of instructions and dereliction of duty in preparing the Brazil Proposal alone was sufficient to call into question the continuation of his employment relationship with IBM. Yet, again and again, he was given a chance to generate fruitful work, all to no avail.

Statistical data has traditionally been used to ferret out probative evidence in discrimination cases. *E. g.,* Parham v. Southwestern Bell Telephone Co., 433 F. 2d 421 (8th Cir. 1970). Such data is generally helpful in hiring cases, and not in discharge cases. However, plaintiff's charge is to some extent neutralized further by the presence of numerous employees of foreign national origin at the IBM Bethesda plant, one of whom was an Arabic, such as the plaintiff.[7]

Towards the end of the litigation, perhaps realizing that he had failed to meet his burden of proof, plaintiff advanced an additional theory upon which he seeks relief. Dr. Bradington stated that even if IBM's personnel did not discriminate against him, they retaliated against him by placing hurdles in his way because he had complained of discrimination.

■ Retaliatory treatment for filing discrimination charges, even if they are non-existent, is prohibited. 42 U.S.C. § 2000e–3(a) provides:

(a) It shall be an unlawful employment practice for an employer to dis-

---

7. Plaintiff, apparently, would have this Court believe that IBM personnel were not biased against any person of a different ethnic background, and that their only prejudice was against Arab Egyptian Moslems. Prejudice against a particular ethnic group may, and sometimes does, exist. But plaintiff has failed to demonstrate the existence of any prejudice whether aimed at foreign nationals in general, or only against persons of his background.

Since plaintiff is of Egyptian origin he claims he is of African descent and is therefore black, though he objects to being referred to as a Negro. Be that as it may, IBM did not choose to challenge the assertion that he is black.

criminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The evidence indicates that no retaliatory measures were taken by IBM as a result of plaintiff's charge. First, it was not until April 19, 1967 that Dr. Bradington had complained of discrimination. His difficulties at IBM had begun long before that date, almost from the very time he was hired, in the Fall of 1965. Second, reasonable efforts were made by IBM to investigate the discrimination charges and to provide Dr. Bradington with suitable work.

Plaintiff has been unemployed since his discharge from IBM. He has steadfastly embarked upon a futile road of litigation to vindicate his unfortunate discharge. His steadfastness is only exceeded by the relentless vigor with which he pursued his objective to a litigious conclusion. Yet, Dr. Bradington has failed to introduce any evidence of discrimination or intent to discriminate, other than his own uncorroborated assertions, which were successfully controverted by the defendant.[8]

For the aforementioned reasons, it is, this 18th day of May, 1973, ordered that judgment be entered for the defendant, International Business Machines Corporation.

8. Plaintiff has also asked this Court to take judicial notice of the Middle Eastern hostilities in 1967, the year of his discharge. He has asserted that the pervading feeling in the United States at the time was anti-Arab, and that the feeling translated itself into a hostile attitude by the IBM personnel towards him. That allegation is unfounded. First, not a scintilla of evidence supported this allegation. And second, Dr. Bradington was put on probation for poor performance in mid-1966, long before the Arab-Israeli hostilities had intensified.