**William Lewis GOODWIN, III, Plaintiff,**

v.

**CITY OF PITTSBURGH, Defendant.**

**Civ. A. No. 76–1155.**

United States District Court,
W. D. Pennsylvania.

Nov. 5, 1979.

---

Thomas C. Reed and Edward A. Olds, Neighborhood Legal Services, Pittsburgh, Pa., for plaintiff.

Arthur G. Gilkes, Jr., Asst. City Sol., Pittsburgh, Pa., for defendant.

## OPINION

SNYDER, District Judge.

This matter, originally assigned to the Honorable John L. Miller of this Court, now deceased, came on for determination in a bench trial. After consideration of the briefs and testimony, we will enter judgment for the Plaintiff in this racial discrimination suit for lost wages.

## FINDINGS OF FACT

1. Plaintiff, William Lewis Goodwin, III, is a black citizen of the United States and a resident of the Western District of Pennsylvania.

2. Defendant, City of Pittsburgh, employs in excess of 15 employees and is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. The City of Pittsburgh is a person within the meaning of 42 U.S.C. § 1983.

4. Goodwin timely filed two charges against the City of Pittsburgh (City) with the Equal Employment Opportunity Commission (EEOC); Charge 1 on May 19, 1975 and Charge 2 on February 25, 1976, amended February 26, 1976. Charge 1 alleged racial discrimination in wages on behalf of Goodwin and another worker; Charge 2 alleged retaliatory and harassing conduct against Goodwin resulting from his having brought Charge 1.

5. The Justice Department issued two right-to-sue letters to Goodwin in response to general requests from Goodwin's then counsel for authorization to initiate litigation.[1] Suit was timely filed on September 9, 1976, and amended to include the charge of retaliation and harassment.

6. Goodwin was hired by the City on March 17, 1975 under the Comprehensive Employment Training Act Program (CETA), 29 U.S.C. § 801 *et seq.*, and was assigned to the Traffic Control Division Shop, Department of Public Works, located at 27th Street and Liberty Avenue. He was interviewed by James Kristiansen, Assistant Director for Operations of the Department of Public Works and, having prior experience, was hired as a PEP Supervisor (Electrician I).[2] He was promised a pay rate of $5.19 per hour, effective immediately.

7. Goodwin was mistakenly classified as a PEP Enrollee (Laborer) at the pay rate of $3.45 per hour.

8. Immediately after he received his first pay, Goodwin made objection concerning his wages. He first asked various Public Works' personnel, including his Foreman, Richard Smith, about it, then, his Shop Supervisor, Raymond Kennedy, and, finally, James Kristiansen. He also spoke with City CETA officials, including Raymond Flaugher.

9. In March 1975, the City hired a second black electrician, Jerry Lawson. Like Goodwin, Lawson was hired under the CETA Program, assigned to the Traffic Control Shop, and began his employment at Laborer wages.

10. After waiting several weeks to receive his retroactive pay, Goodwin again contacted Raymond Flaugher for some explanation, and was informed he had been hired subject to a probationary period. Believing this to be false, Goodwin contacted Kristiansen for further explanation but was informed by Kristiansen that he had received his full and final explanation from Flaugher.

11. In April 1975, the City hired three white electricians under the CETA Program and assigned them to the Traffic Control Shop. Unlike Goodwin and Lawson, these men began their employment at Electrician I wages.

12. In April 1975, after considerable difficulty, Goodwin's wages were increased to the Electrician I rate. However, he did not receive a retroactive payment.

13. Still without his retroactive pay, and realizing the three white Electricians had been hired without a probationary period, Goodwin filed his first charge with the EEOC on May 19, 1975, including Lawson therein.

14. On July 8, 1975, Goodwin finally received a retroactive pay check, which he believed compensated him for all but one week of the wages due him. Overtime

---

1. The letter of June 8, 1976 stated, in part: "Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge, and this Department has determined that it will not file any lawsuit based upon that charge within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.*, against the above-named respondent."

2. The terms "PEP Enrollee" and "PEP Supervisor" are payroll terms used for CETA employees. PEP Enrollee signifies that the individual receives less than $10,000 per year and thus corresponds to the job classification of Laborer. PEP Supervisor means the CETA employee receives more than $10,000 yearly and thus corresponds to an Electrician I classification.

work complicated Goodwin's understanding of his wages.

15. Shortly after Charge 1 was filed, Goodwin received a call from Flaugher asking him to withdraw the EEOC charge. Several days later, Kristiansen made a similar request. On both occasions, Goodwin stated he would not consider withdrawing the charge.

16. From the time of these conversations with City officials about his first charge with the EEOC until late in January 1976, Goodwin had no contact with any City official about his, or anyone else's wage rates. Throughout this period, Goodwin discharged his duties in a competent manner, twice receiving satisfactory job performance evaluations.

17. On or about September 22, 1975, Goodwin changed from day shift to the 4 P.M. to 12 A.M. shift, at his own request, so he could pursue a course of study during the day.

18. On February 24, 1976, Goodwin signed a conciliation agreement at the Office of the EEOC on Charge 1 in which he mistakenly admitted that he had been compensated for all of the back pay to which he was entitled, although overtime pay was still in dispute.

19. At approximately 9 P.M. on February 24, 1976, Goodwin received a series of phone calls from a white Traffic Control Dispatcher, Frank McDonough, who worked in the City-County Building. During the last call, McDonough, who had a known history of antagonism toward CETA employees, particularly minority workers, berated Goodwin by calling him a "scab, a nigger and PEP prick". In response to this unprovoked personal attack, Goodwin left his job site to get some kind of explanation from McDonough or his supervisor. A heated verbal exchange followed which resulted in City Police and Fire Officers being summoned to quiet the disturbance. Following this incident (which lasted less than an hour), Goodwin reported it to his Foreman, Richard Smith, and returned to work.

20. On February 25, 1976, Goodwin filed an affidavit and charge with the EEOC (Charge 2), alleging that the City had retaliated against him for filing his first charge with the EEOC on May 15, 1975 by stopping his overtime.

21. Later that same day, near the beginning of the 4 P.M. shift, Goodwin was summoned to a meeting to discuss the events of the previous evening with Kristiansen and another City official. Although he was permitted to explain why he had acted as he did, at the close of the meeting Kristiansen handed Goodwin a notice of indefinite suspension, which had been previously prepared.

22. The next day, February 26, 1976, Goodwin returned to the EEOC and amended his charge to include a claim of racial harassment and that his suspension following the McDonough incident was unlawful.

23. On March 1, 1976, Goodwin's indefinite suspension was changed to a three day suspension and, on the same day, Raymond Hess, Director of Public Works, suspended McDonough for five days, pending discharge. On March 9, 1976, McDonough, in the presence of the Mayor's Executive Secretary, Bruce Campbell, resigned for disciplinary reasons.

24. Director Hess wanted to terminate Goodwin because of the McDonough incident, but as a result of Kristiansen's intervention and on the advice of Campbell, he reduced the suspension to three days.

25. During the March 5 to March 24 period, Goodwin had no communications with Kristiansen or any other official of the CETA Program about his wages, or other treatment which were concerning him. Shortly after his return to work, he did discuss again his wage situation with John Brent, but at no time during his discussions was Goodwin insubordinate or disrespectful to Brent.

26. John Brent had assumed the duties of Traffic Control Supervisor on February 11, 1976.

27. On March 25, 1976, within two weeks of John Brent's receipt of Goodwin's

second EEOC charge, and near the time Brent complained to Kristiansen about Goodwin's involvement in other CETA employees' wage complaints, Kristiansen went to the Shop to discuss both of these matters with Goodwin. Kristiansen, at that time, was annoyed generally about Goodwin's decision to go outside City channels with a grievance again, and was particularly annoyed that Goodwin had alleged his suspension was wrongful. This latter annoyance resulted from Kristiansen's belief that he had been instrumental in saving Goodwin's job after the McDonough incident. Goodwin had no knowledge about Kristiansen's intervention and, given Kristiansen's prior reaction to his wage claims and his role at Goodwin's suspension hearing, had no reason to assume Kristiansen had interceded for him.

28. At the meeting on March 25, 1976, only Goodwin, Kristiansen and Brent were present. Kristiansen opened the discussion by telling Goodwin that he did not feel it was reasonable for Goodwin to have filed another complaint against the City. He also stated that Goodwin was out of line in discussing wage disputes with other CETA workers. Kristiansen again asked that Goodwin withdraw his EEOC charges and stop encouraging others to challenge the CETA wage policy. He also informed Goodwin that he had corrected Goodwin's pay problems and saved him from termination after the McDonough incident. Goodwin reacted negatively to Kristiansen's comments and told him "you're a liar, you always were, and you always will be." Goodwin also said he would not stop his involvement with the EEOC. Kristiansen then told Goodwin that if that was his attitude, he would be terminated.

29. During the March 25, 1976 meeting, Kristiansen told Goodwin he was a good technical employee, but his abrasive and hostile attitude toward his superiors hurt his future opportunities with the City. He said Goodwin's attitude problem was typified by his characterization of job grievances as racial discrimination, and his filing of racial complaints when the grievances could be resolved in another manner. This approach was not justified and only aggravated the situation. Kristiansen also told Goodwin that he would be fired.

30. Following the meeting, Goodwin returned to work and Kristiansen had a termination notice drafted stating that Goodwin was being terminated because of his "wholly uncooperative attitude", his "disruptive influence" on other workers, and because he was "bad for employee morale". Thereafter, Kristiansen informed Director Hess of his decision to fire Goodwin and obtained his signature on the termination letter, which was delivered to Goodwin that night. Kristiansen, however, never told Hess that he felt Goodwin had been insubordinate to him that day. In fact, Kristiansen conceded that the official termination was intended to insulate the City from potential litigation.

31. Director Hess made no investigation of the grounds alleged for Goodwin's termination prior to accepting Kristiansen's recommendation.

32. Following his discharge, Goodwin unsuccessfully sought employment with Bell Telephone Company, and unsuccessfully applied for unemployment benefits. He was without work until June 1979, when he was hired by Marshall Elevator.

33. When Goodwin was discharged, there were between six to eight CETA workers at the Traffic Control Shop. Subsequent to his discharge until the present time, all the CETA workers who worked with Goodwin continued on as City electricians, except two who were fired and one who left voluntarily. During this time, City electricians worked a standard 40 hour week at the following rates of pay: 1976—$5.67 per hour; 1977—$6.06 per hour; 1978 —$6.49 per hour; 1979—$6.87 per hour.

34. Goodwin's discharge was substantially motivated by the City's, and in particular, Kristiansen's, dislike of Goodwin's involvement in protected activities. This is buttressed by Kristiansen's admission at trial that he did have the matter of Goodwin's protected activities on his mind both before and during the meeting which resulted in Goodwin's discharge.

35. Goodwin's comments to Kristiansen on March 25, 1976, although not necessarily excusable, were not unjustified, and were clearly unpremeditated and arguably provoked.

## DISCUSSION

### A. *The Title VII Claim*

Initially, we must decide whether Goodwin's termination was motivated "at least in part" as a response to his contacting the EEOC or, in any event, by way of discriminating against him as a black person.

Section 704(a) of Title VII forbids an employer from discriminating against any of his employees "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter." 42 U.S.C. § 2000e–3(a).

Section 703(a)(1) of Title VII provides, in part, that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the employee's race, color, or sex. 42 U.S.C. § 2000e–2(a)(1).

Our Court of Appeals, in *Hicks v. ABT Assoc., Inc.,* 572 F.2d 960, 968–9 (3rd Cir. 1978), framed the discussion this way:

"Hicks' deposition raises an issue of whether he was discharged at least in part as a response to his contacting the Department of Housing and Urban Development (HUD) about alleged discriminatory practices of defendant. During his dispute with Abt Associates over several matters, Hicks had occasion to contact HUD, which provided funding for the project on which he was employed, the National Labor Relations Board, and finally the EEOC. From the evidence in the record, at least the contact with HUD, the first agency to which Hicks turned, might have occurred before the decision to discharge him. Hicks was told of his supervisor's decision to recommend the termination of his employment on July 13, 1973. The record does not clearly show when the company in fact decided to discharge him. The decision took effect on July 27. Hicks' deposition contains evidence that he had contacted HUD as early as July 9. Plaintiff also gave specific evidence of a conversation showing that defendant's home office was disturbed by the contact with the agency. The coincidence of the reaction at Abt Associates to the complaint to HUD and the decision to end Hicks' employment raises an inference that the complaint to HUD was one of the reasons for the decision to fire Hicks.

\* \* \* \* \* \*

Even if a charge filed with the EEOC is found to be without merit, the employee is protected in making that charge by section 704 and cannot be fired. *See, e. g., Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, 1004–05 (5th Cir. 1969); *Bradington v. International Business Machines Corp.,* 360 F.Supp. 845, 854 (D.Md. 1973), *aff'd mem.,* 492 F.2d 1240 (4th Cir. 1974)." (Footnotes omitted)

Here, the Plaintiff, in accordance with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), offered proof that (1) he had engaged in opposition to Title VII discrimination and participated in a Title VII proceeding; (2) that he suffered adverse action from an employer contemporaneous with or subsequent to the opposition and participation; and (3) that there is evidence of a causal connection between the underlying act and the retaliatory action. *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.,* 425 F.Supp. 318 (D.Mass.), *aff'd* 545 F.2d 222 (1st Cir. 1976). The burden then shifts to the defendant to articulate a nondiscriminatory reason for the adverse job action. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). If the defendant can articulate such a reason, the burden then shifts to the plaintiff to show that the reason is pretextual in nature. *McDonnell Douglas Corp. v. Green, supra;*

*Hochstadt, supra.* If retaliation played a part in the adverse action, even though not the sole reason, the employer's action is a violation of 42 U.S.C. § 2000e–3. *EEOC v. Locals 14 and 15, Int'l Union of Operating Engineers,* 438 F.Supp. 876 (S.D.N.Y.1977); *EEOC, v. Kallir, Philips, Ross, Inc.,* 401 F.Supp. 66 (S.D.N.Y.1975), *aff'd* 559 F.2d 1203 (2d Cir. 1977).

█ As we have found, at the meeting held March 25, 1976, which resulted in Goodwin's dismissal, Mr. Kristiansen directly raised the issue of the EEOC charges and requested that they be withdrawn. Although both Kristiansen and Brent denied at trial that any direct request to withdraw the EEOC charges was made at that meeting, both men did concede that Kristiansen told the Plaintiff that day that he (Kristiansen) did not think it was reasonable that the City was being subjected to such charges by its employees in general and the Plaintiff in particular, when other (unexplained) avenues to air their grievances existed. Also, Kristiansen admitted having the matter of Goodwin's involvement in protected activities on his mind when he decided to "recommend" Goodwin's dismissal. Furthermore, Goodwin testified that a direct demand to drop his first EEOC charge had been made earlier to him by Kristiansen and Raymond Flaugher, and neither Kristiansen nor Flaugher denied this at trial.

Finally, the timing of the termination meeting has unique significance, particularly in light of Mr. Kristiansen's testimony that the meeting was a chance occurrence. The EEOC had mailed Goodwin's second charge to the chief executive officer at his work site, John Brent at that time, on or about March 12, 1976. Within a few days, a meeting took place to discuss this charge and other protected activities on the part of the Plaintiff. Although Kristiansen said he visited the Shop at least once a week, he offered no explanation why a date so close on the heels of an EEOC charge was chosen to discuss Goodwin's and the City's differences. The closeness of the discharge to the time the employer learns of the employee's protected activities cannot be minimized as a fact tending to establish wrongful motive.

Nor can we overlook the fact that the City disregarded its established procedures for termination of employees. No investigation was carried out by the Public Works Director and the person who prepared the termination notice admittedly fabricated what was contained in that letter. The reason given for Goodwin's termination was "your wholly uncooperative attitude and disruptive influence among other employees are prejudicial to the effective operation of the Traffic Control Division. Additionally, you have an adverse effect on the morale of other employees." The letter was signed by Raymond J. Hess, Director-DPW, but was composed by Brent, at Kristiansen's direction. Almost unbelievably, Kristiansen testified that the letter was written in this way:

"Q. Why if that [being called a liar or insubordination] was the reason, wasn't it in the letter?

A. I expected Goodwin would file suit and this language had a better opportunity to substantiate it [the firing]."

The City claimed that the totality of Goodwin's actions showed that he was in fact a troublemaker. This justification was pretextual, for we have found instead that his conduct in the McDonough incident was provoked, and Kristiansen testified that he had actively opposed Goodwin's dismissal over that incident. One gets the impression that the City was truly upset about the filing of EEOC charges and considered Goodwin's conduct in this respect to be "disruptive", but the law permits no such reaction. Nor were the charges of being a "disruptive influence on other employees" or "hav[ing] an adverse effect on the morale of other employees" anything but a pretext. To the contrary, there was considerable testimony that Goodwin was a competent worker, as attested to by the performance ratings given by his supervisors, and that he got along well with his co-workers and foremen.

With respect to the element of alleged insubordination, which undoubtedly occurred when Goodwin called Kristiansen a liar, we have found that Kristiansen's discharge of Goodwin was not in reaction to the insubordination alone, but also to Goodwin's previous activities, which we have found to be protected. Title VII cases require the Court to determine whether the improper motive was "at least in part a factor" in the discharge. *See EEOC v. Kallir, Philips, Ross, Inc., supra; Mead v. U.S. Fidelity & Guaranty Co.,* 442 F.Supp. 114, 131 (D.Minn.1977); *Slotkin v. Human Development Corp. of Metropolitan St. Louis,* 454 F.Supp. 250, 257 (E.D.Mo.1978); *EEOC v. Locals 14 and 15, Int'l Union of Operating Engineers, supra,* as approved in *Hicks v. ABT Associates, Inc.,* 572 F.2d 960 (3rd Cir. 1978). Goodwin met that burden here since we find retaliatory motive to have played a substantial causal role in the decision to fire Goodwin when, on only one occasion, he called his boss "a liar", under circumstances which were, at the least, provoked, and, at most, justified. *Cf. Tidwell v. American Oil Co.,* 332 F.Supp. 424, 430 (D.Utah 1971). Goodwin had a good overall work record but Kristiansen admitted to the general belief that employees should not go outside the City systems to pursue a claim of racial discrimination and testified he had called the meeting in question to inform Goodwin that the City did not like his conduct. Taken in the light of Kristiansen's fabrication of the "official" version of Goodwin's dismissal, one is led to the belief that insubordination played little, if any, role in the decision to terminate the Plaintiff.

The City's official explanation of Goodwin's dismissal, as set forth in his termination notice, alleged that he was terminated because of his "uncooperative attitude", his "disruptive influence on other employees', and because he was "bad for employee morale". However, it was admitted at trial that the official version was a fabrication. It was at trial that the City offered, for the first time, another reason, *i. e.,* insubordination to a supervisor. Assuming arguendo that the alleged insubordination actually occurred in the blunt manner suggested, it was simply not the reason Goodwin was fired, nor could it have been. The fact that insubordination was never previously advanced as a reason (not even a few weeks after the firing at the unemployment hearing), coupled with the fact that Kristiansen never told his supervisors about any such insubordination, undercuts any inference that insubordination was a dominant factor. To be sure, calling a supervisor a liar is a serious matter. However, it takes on less significance if it occurs privately, during a heated debate initiated by the employer, about the employee's decision to engage in protected activities, and when it appears that the comment was made in response to, *inter alia,* a comment by Kristiansen that he saved Goodwin's job, a very patronizing suggestion and one which Goodwin had every reason to believe to be false. On this latter point, it must be considered that only at trial did Kristiansen admit that he had in fact promised full wages to Goodwin at the time he was hired. The obvious fact that Kristiansen never bothered to tell the City this, or at least permitted the City to vigorously oppose Goodwin's valid claim, totally undercuts his credibility.

The Plaintiff has therefore proved that his discharge was unlawfully motivated and has established his Title VII claim.

### THE SECTION 1983 CLAIM

■ In view of our discussion above, we are satisfied that Goodwin has shown that his conduct was constitutionally protected and that such conduct played a substantial causal role (see *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)) in the City's decision to fire Goodwin. "Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct.

568, 576, 50 L.Ed.2d 471, 484 (1977). *See also Givhan v. Western Life Consolidated School District,* 439 U.S. 410, 99 S.Ct. 673, 58 L.Ed.2d 619 (1979).

Here, the City failed to prove that, absent the protected activity, a decision to fire Goodwin would have been reached on March 25, 1976. Goodwin had an overall good work record and the City offered no proof of involvement in other than protected activities. Nor did the City offer proof that the insubordination was of the type or severity for which a satisfactory employee was, or would have been justifiably discharged. As we have stated previously, calling a supervisor a liar is a serious matter. It takes on less significance when it occurs privately during a heated debate initiated by the supervisor about an employee's decision to engage in protected activities, and when it appears that the comment was made in response to a very patronizing suggestion which the supervisor was not sure was correct, and that Goodwin had every reason to believe was false.

## THE BACK PAY AWARD

In this situation, Goodwin has shown that he applied for work with Bell Telephone Company and sought unemployment benefits with its attendant requirement of actively seeking employment.

 In *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3rd Cir. 1974), *vacated on other grounds* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), the Court of Appeals for the Third Circuit held that denial of procedural due process in an employment situation can justify reinstatement with back pay. In the instant situation, Goodwin is not seeking reinstatement, but does seek back pay. He did not present any evidence to establish any damage beyond the loss of salary and, therefore, we conclude that no legal relief is

required.[3] *See D'Iorio v. County of Delaware,* 447 F.Supp. 229, 242 (E.D.Pa.1978).

It would appear to us that it is the City's burden to show any mitigation of damages by failure of the Plaintiff to exercise reasonable diligence in seeking replacement earnings. *See DiSalvo v. Chamber of Commerce,* 568 F.2d 593, 598 (8th Cir. 1978). *See also Sprogis v. United Airlines,* 517 F.2d 387 (7th Cir. 1975), and *Taylor v. Philips Industries, Inc.,* 593 F.2d 783 (7th Cir. 1979) (per curiam).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter under 28 U.S.C. § 1343, 42 U.S.C. § 2000e, and 42 U.S.C. § 1983.

2. The Plaintiff has established a prima facie case under Title VII by showing his filing of EEOC charges were causally related to his discharge.

3. While Defendant articulated legitimate nondiscriminatory reasons for discharging Plaintiff, we hold Plaintiff has satisfied the burden of showing them to be pretextual.

4. The Plaintiff has been wrongfully discharged in violation of 42 U.S.C. § 2000e–3(a) and is entitled to judgment in the Title VII claim.

5. The Plaintiff has established a prima facie case of wrongful discharge under 42 U.S.C. § 1983 by showing he engaged in a protected activity and this conduct was a substantial motivating factor in his discharge.

6. Defendant failed to show by the preponderance of the evidence that it would have reached the same decision in the absence of the protected activity.

7. Plaintiff is entitled to judgment on his Section 1983 claim.

---

**3.** While prejudgment interest is an available remedy to a Plaintiff in a Title VII action, the decision whether or not to award such interest is within the discretion of the trial court. *Taylor v. Philips Industries, Inc.,* 593 F.2d 783 (7th Cir. 1979); *Vant Hul v. City of Del Rapids,* 462 F.Supp. 828 (D.S.D.1978). We decline to award prejudgment interest here because of Goodwin's dilatory prosecution of the case. *See Lodges 743 and 1746 International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. United Aircraft Corp.,* 534 F.2d 422, 446 (2d Cir. 1975), *cert. denied* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976).

8. Defendant having failed to mitigate the liability or refute the damage claim, Plaintiff is entitled to recover back pay from the date of his wrongful discharge to the date of his subsequent employment.